CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 2 1 2015

JULIA C. DUDLEY, CLERK
BY:
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal Action No. 3:14CR00016 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| DANIEL LAMONT MATHIS, ) | |
| SHANTAI MONIQUE SHELTON, ) | By: Hon. Glen E. Conrad |
| MERSADIES LACHELLE SHELTON, ) | Chief United States District Judge |
| KWELI UHURU, ) | |
| HALISI UHURU, and ) | |
| ANTHONY DARNELL STOKES, ) | |
| ) | |
| Defendants. ) | |

On July 8, 2015, the parties appeared before the court for a hearing on the following issues: (1) whether to transfer venue from the Charlottesville Division; and (2) whether to empanel an anonymous jury. For the reasons stated in open court and for those set forth below, the court will transfer venue to the Roanoke Division and empanel a semi-anonymous jury.

## Background

On October 22, 2014, Daniel Mathis, Shantai Shelton, Mersadies Shelton, Kweli Uhuru, Halisi Uhuru, and Anthony Stokes were charged in a 36-count superseding indictment returned by a grand jury in the Western District of Virginia. The superseding indictment alleges that the defendants are members of the 99 Goon Syndikate, a street gang affiliated with the national Bloods gang, and that the members of the 99 Goon Syndikate conspired with one another to conduct and participate in the conduct of the affairs of the gang through a pattern of racketeering activity, consisting of assaults, robberies, burglaries, kidnapping, carjacking, murder, drug trafficking, and obstruction of justice.

Four of the defendants – Daniel Mathis, Shantai Shelton, Mersadies Shelton, and Kweli Uhuru – are charged with offenses related to the kidnapping and murder of Kevin Quick, a reserve captain with the Waynesboro Police Department. Although two of these offenses are punishable by death, the government has elected not to seek the death penalty.

On May 4, 2015, a jury trial commenced in the Charlottesville Division. Jury selection was conducted over a two-day period. On May 5, 2015, at the conclusion of the second day, sixteen jurors were selected from a non-anonymous jury panel, inasmuch as neither the government nor the defendants had sought the selection of an anonymous jury.

On May 6, 2015, the parties made their opening statements. That same day, it was discovered that one of the defendants had removed a copy of a jury list from the courtroom the day before and taken it with him to his jail cell. The jury list contained identifying information for the entire jury panel, including the panel members' names, mailing addresses, birth years, employers, occupations, and levels of education; the last four digits of their social security numbers; and their spouses' occupations. The list remained in that defendant's possession for at least fifteen hours before it was returned to the courthouse.

On May 7, 2015, the court held a conference in chambers, on the record, during which Agent Scott Cullins of the Federal Bureau of Investigation ("FBI") expressed concerns regarding the safety of the individuals on the jury list, and the fact that the jury panel was not anonymous. Agent Cullins indicated that his concerns were shared by higher ranking officials with the FBI, as well as members of the Virginia State Police and the Louisa County Sheriff's Department. Agent Cullins emphasized that the concerns were based, at least in part, on the defendants' affiliation with the national Bloods gang, "which has a history of not only retribution, but also

preventative actions." May 7, 2015 Tr. 4. Agent Cullins strongly advised that all of the jury panel members be notified of the situation.

Based on the concerns and recommendation of Agent Cullins, and after receiving input from counsel, the court elected to send letters to all of the jury panel members, including the sixteen seated jurors, advising them that the jury list had been retained by one defendant overnight. In light of the court's decision, several defendants indicated that they intended to move for a mistrial.

The court reconvened on the morning of May 12, 2015. Mersadies Shelton, Shantai Shelton, Halisi Uhuru, and Anthony Stokes formally moved for a mistrial at that time. The court granted the motions and excused those defendants from any further involvement in the case that day.

Daniel Mathis and Kweli Uhuru, who did not join in the motion, requested to voir dire the sixteen seated jurors to determine whether they could still be fair and impartial in light of the information relayed by the court. The court granted their request and reconvened on the record in the jury room, where the court, and counsel for the government, Mathis, and Kweli Uhuru, met with the sixteen jurors individually. Based on the responses provided by several of the jurors to questions posed by counsel and the court, Mathis and Kweli Uhuru also formally moved for a mistrial. The court granted the motions and declared a mistrial of the entire case.

This case received extensive pretrial publicity due to the nature of the charged offenses, particularly those related to the kidnapping and murder of Kevin Quick, as well as the defendants' gang affiliations. Following the May 7, 2015 conference in chambers, media outlets began reporting on the removal of the jury list containing the entire jury panel's personal information. They quoted from the transcript of the conference in chambers, and emphasized

that law enforcement officials were concerned about the safety of the jurors in light of the defendants' connection with the national Bloods gang.

Based on the foregoing circumstances, the majority of the defendants have moved for a change of venue. Additionally, the government has moved for the use of an anonymous jury at the next trial.

## Discussion

### I. Venue

In criminal cases, "[b]oth the Constitution and the statutes implementing it require that criminal trials be conducted where the crime was 'committed.'" United States v. Umaña, 750 F.3d 320, 334 (4th Cir. 2014) (citing U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; 18 U.S.C. §§ 3235-3237; Fed. R. Crim. P. 18). When a crime is committed in more than one district, it "may be . . . prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Likewise, a conspiracy may be prosecuted in any district "in which an act in furtherance of the conspiracy was committed." United States v. Gilliam, 975 F.2d 1050, 1057 (4th Cir. 1992). In this case, because the overt acts and substantive crimes charged in the superseding indictment were allegedly committed in both the Western and Eastern Districts of Virginia, venue would be proper in either district.

The government elected to prosecute the case in the Western District, and the indictment was filed in the Charlottesville Division, where a number of the overt acts and elements of the substantive offenses are alleged to have been committed. The majority of the defendants now seek to transfer venue from the Charlottesville Division. Some of the defendants have requested to transfer venue to the Roanoke Division of this district, while others have moved to transfer venue to the Richmond Division of the Eastern District.

The Federal Rules of Criminal Procedure distinguish between intradistrict and interdistrict transfers. Intradistrict transfers are governed by Rule 18 of the Federal Rules of Criminal Procedure, while interdistrict transfers are governed by Rule 21.

Under Rule 18, a trial need only be held "in a district where the offense was committed." Fed. R. Crim. P. 18. There is no constitutional or statutory right to trial in a particular division of a judicial district. United States v. Erwin, 155 F.3d 818, 824 (6th Cir. 1998). Instead, "[t]he court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice." Fed. R. Crim. P. 18. Although the text of Rule 18 refers only to considerations of convenience and the prompt administration of justice, the court may also look to other factors such as "docket management, courthouse space and security, and . . . pretrial publicity." United States v. Lipscomb, 299 F.3d 303, 342 (5th Cir. 2002); see also United States v. Merrill, 513 F.3d 1293, 1304 (11th Cir. 2008) (explaining that that "the prompt administration of justice" includes "matters of security" and "the state of the court's docket generally," and that courts "must weigh the impact the trial location will have on the timely disposition of the instant case and other cases"). "The convenience of the prosecution, however, is not a factor to consider in changing venue." United States v. Dickie, 775 F.2d 607, 610 (5th Cir. 1985).

After considering all of the relevant factors, the court concludes that an intradistrict transfer to the Roanoke Division is warranted in the instant case. Because of the extensive publicity regarding the removal of the jury list and the resulting safety concerns, the court has been advised that a much larger jury pool would have to be assembled in the Charlottesville Division in order to seat a fair and impartial jury. This would consume judicial resources, protract the trial proceedings, and, in turn, negatively affect the disposition of other cases on the

5

docket of the undersigned district judge and other judges who preside over cases in the Charlottesville Division. See Lipscomb, 299 F.3d at 342 (noting that "[a] district court may consider docket management in its Rule 18 balancing," and that "docket issues may even outweigh convenience factors that point entirely the other way").

In addition, the court is of the opinion that the Roanoke Division is better equipped to handle this particular case's "security requirements" and "other facilities needs." Id. at 343. The Poff Federal Courthouse in Roanoke has more than one courtroom that can adequately accommodate the large number of defendants, attorneys, witnesses, and potential jurors, as well as multiple secured meeting rooms adjacent to the United States Marshals Service, which can be used by the defense attorneys to meet with their clients. Likewise, the Roanoke Division of the Marshals Service has more manpower than the Charlottesville Division, and is adequately and appropriately staffed to manage the security issues involved in this case. The court also notes that the Poff Federal Courthouse is located in close proximity to the Roanoke City Jail and the Western Virginia Regional Jail, both of which could accommodate the sizeable number of incarcerated defendants and witnesses. See id. ("Courtroom availability, unsurprisingly, is a permissible consideration. So too are the amount of jail space available for defendants or witnesses and the adequacy of the security arrangements in a particular criminal trial.").

The court recognizes that Roanoke will be a longer drive for some of the victims and witnesses. However, the court is convinced that any inconvenience to victims and witnesses is outweighed by the other relevant factors discussed above, which militate in favor of transferring venue to the Roanoke Division.

To the extent that some of the defendants contend that the circumstances warrant an interdistrict transfer to the Richmond Division of the Eastern District, the court is unpersuaded.

Even assuming that there has been greater media coverage of the case in Roanoke than in Richmond, the court is convinced that the geographical reach of the Roanoke Division is large enough that a fair and impartial trial can be conducted in this division and, thus, that an interdistrict transfer for prejudice is not required. See Fed. R. Crim. 21(a) ("Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."); see also United States v. Higgs, 353 F.3d 281, 308 (4th Cir. 2003) (emphasizing that prejudice to a defendant's right to a fair trial resulting from pretrial publicity may be presumed "only in extreme circumstances") (internal citation and quotation marks omitted)). Likewise, while Richmond may be more suitable for some of the attorneys, witnesses, and victims, the court is unable to conclude that an interdistrict transfer for convenience is warranted under Rule 21(b). See Fed. R. Crim P. 21(b) ("Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.").

For all of these reasons, the motions to transfer venue to the Roanoke Division will be granted, and the motions to transfer venue to the Richmond Division of the Eastern District will be denied.

## II. Anonymous Jury

The government has now filed a motion for an anonymous jury. For the following reasons, the motion will be granted in part, and the court will empanel a semi-anonymous jury.

The term "anonymous jury" does not have one particular meaning. United States v. Dinkins, 691 F.3d 358, 371 (4th Cir. 2012). "A jury generally is considered to be 'anonymous'

when a trial court has withheld certain biographical information about the jurors either from the public, or the parties, or both." Id. at 371. A lesser degree of anonymity may involve disclosing the names of the jury panel members to the parties, but identifying the members only by number in open court. Id. Greater degrees of anonymity may entail withholding the names, addresses, employers, or other biographical information about the jury panel members or their spouses. Id.

In a non-capital case, a federal district court may empanel an anonymous jury when "'the interests of justice so require.'" Id. at 372 (quoting 28 U.S.C. § 1863(b)(7)). In a capital case, however, the court "may only empanel an anonymous jury after determining, 'by a preponderance of the evidence that providing the list [of the members of the venire and their places of abode] may jeopardize the life or safety of any person.'" Id. (quoting 18 U.S.C. § 3432). Therefore, the court must base its decision to empanel an anonymous jury in a capital case on the evidence in the record and may not rely solely on the indictment to support its decision. Id. at 373. As long as there is sufficient evidence in the record to support the decision, an evidentiary hearing is not required. Id. at 374.

Although this case was originally charged as a capital case with respect to four of the six defendants, the government is not seeking the death penalty. The United States Court of Appeals for the Fourth Circuit has not yet addressed whether a case loses its capital nature for for purposes of 18 U.S.C. § 3432 if the government does not seek the death penalty. See United States v. Hall, 506 F. App'x 245, 248-49 (4th Cir. 2013) (declining to resolve the issue). For purposes of the instant motion, the court will assume, without deciding, that the higher standard for empaneling an anonymous jury applies, even though the government is not seeking a death sentence for any of the defendants.

The decision to empanel an anonymous jury is "an unusual measure which must be plainly warranted by the particular situation presented." Dinkins, 691 F.3d at 372. The court may empanel an anonymous jury only in rare circumstances when two conditions are met: "(1) there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised absent anonymity; and (2) reasonable safeguards have been adopted to minimize the risk that the rights of the accused will be infringed." Id.

In Dinkins, the Fourth Circuit identified five factors, originating from United States v. Ross, 33 F.3d 1507 (11th Cir. 1994), and referred to as the Ross factors, for "determining whether there are strong reasons supporting the empaneling of an anonymous jury":

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

Id. at 373 (quoting Ross, 33 F.3d at 1520). These factors are relevant to cases involving capital, as well as non-capital, offenses to the extent that they inform the court's decision as to "whether an anonymous jury is required to protect 'the life or safety of any person.'" Id. (quoting 18 U.S.C. § 3432). The list of factors "is not exhaustive," however, "nor does the presence of any one factor or set of factors automatically compel a court to empanel an anonymous jury." Id. Instead, the court "must always engage in a context-specific inquiry based upon the facts of the particular case before the court." Id.

Applying the standards outlined in Dinkins, the court must determine whether the record supports a finding by a preponderance of the evidence that disclosing the names and addresses of

the jury panel members could jeopardize their safety.[1] For the following reasons, the court answers this question in the affirmative.

First, the record supports the conclusion that the defendants were involved in organized crime. The superseding indictment alleges that the defendants were members of a racketeering enterprise known as the 99 Goon Syndikate, a street gang affiliated with the national Bloods gang, and that the enterprise engaged in organized criminal activities, including assaults; burglaries; robberies; drug trafficking; the kidnapping, carjacking, and murder of Kevin Quick; and obstruction of justice. The allegations in this regard are supported by statements of facts agreed to by co-conspirators who have already entered pleas of guilty, as well as other evidence presented by the government at pretrial hearings. Accordingly, the first Ross factor weighs in favor of empaneling an anonymous jury.

Second, the record supports the conclusion that the defendants participated in a group with the capacity to harm jurors. The evidence presented by the government reveals that the 99 Goon Syndikate is a violent gang, and that it is affiliated with the larger Bloods criminal street gang. The superseding indictment alleges that the Bloods gang is known for committing acts of violence against individuals who are perceived to be rivals of the organization, including individuals who are believed to have cooperated with law enforcement. The allegations in this regard are consistent with the concerns raised on the record by Agent Cullins. Consequently, the second Ross factor also weighs in favor empaneling an anonymous jury.

---

[1] This standard from 18 U.S.C. § 3432 does not apply to Halisi Uhuru and Anthony Stokes, who are not charged with offenses punishable by death. Nonetheless, "[e]vidence that supports a finding under the more restrictive Section 3432 standard, that disclosure of identifying information about the venire members may jeopardize their lives or safety, necessarily will also support a finding under the broader standard in Section 1863(b)(7) that the 'interests of justice' support anonymity of the venire." Dinkins, 691 F.3d at 377.

The record also supports a finding that the defendants previously engaged in efforts to interfere with the judicial process. Four of the defendants are charged with murdering Kevin Quick, in violation of 18 U.S.C. § 1512(a)(1)(C), which prohibits tampering with a witness, while the two remaining defendants are charged with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1), based on their alleged involvement in the concealment and destruction of evidence associated with Quick's murder. Additionally, during the first trial, prior to the declaration of a mistrial, one of the defendants removed the jury panel list from the courtroom and took it to his jail cell overnight. While there is no evidence that this defendant duplicated the list or transferred any of its contents, the fact that he had the information in his cell for approximately fifteen hours raised significant security concerns. Consequently, the third Ross factor also weighs in favor of empaneling an anonymous jury.

The fourth Ross factor requires consideration of whether the defendants face the possibility of severe punishments if convicted. The four defendants charged with offenses related to the murder of Kevin Quick face a potential mandatory life sentence. The court has been advised that the other two defendants could face sentences in the range of 360 months to life with applicable enhancements under the United States Sentencing Guidelines. These potential punishments lend support to the conclusion that the defendants have "an incentive to resort to extreme measures in any effort to influence the outcome of their trial." Dinkins, 691 F.2d at 376 (internal citation and quotation marks omitted). Accordingly, this factor weighs in favor of empaneling an anonymous jury.

Finally, the investigation and prosecution of this case has resulted in considerable media attention, beginning with the initial reports that Kevin Quick was missing, the recovery of his body, the return of the indictment against the defendants, and the guilty pleas of multiple

codefendants. More recently, the commencement of the trial in May of 2015, the removal of the jury list by one of the defendants, and the subsequent declaration of a mistrial, were well-covered by numerous media outlets throughout Virginia. It naturally follows that there will be extensive publicity surrounding the retrial of the defendants. Such publicity will enhance the possibility that the names of the jurors will become public and, in turn, potentially expose the jurors to the possibility of intimidation and harassment. Consequently, the fifth Ross factor weighs in favor of empaneling an anonymous jury.

Based on the foregoing application of the Ross factors, the court concludes that the record establishes by a preponderance of the evidence that the safety of the jury panel members may be jeopardized if their names are provided to the defendants. This determination, however, does not end the court's inquiry. The court must also consider whether reasonable safeguards can be taken to minimize the risk that the rights of the defendants will be infringed.[2] Id. at 372, 378. For the following reasons, the court concludes that adequate safeguards can be implemented.

First, in order to protect the defendants' ability to conduct an informed voir dire examination, the court intends to empanel a semi-anonymous jury. Consistent with the protocol utilized by judges in the Eastern District of Michigan, the court will permit counsel to have full access to all juror information. However, counsel will be prohibited from sharing the jury panel members' names, addresses, and places of employment with anyone else, including their clients. The jury selection process will be accomplished by numbers and not by names, and counsel must

---

[2] In Dinkins, the Fourth Circuit explained that the decision to empanel an anonymous jury may affect a defendant's right to a presumption of innocence by suggesting to the jurors that "the defendant is a dangerous person from whom the jurors must be protected." Dinkins, 691 F.3d at 372 (internal citation and quotation marks omitted). Moreover, a court's decision to withhold certain biographical information "may affect a defendant's constitutional right to trial by an impartial jury, by hindering the defendant's ability to conduct an informed voir dire examination and to challenge effectively the seating of individual jurors." Id.

refrain from referencing names, addresses, and places of employment during voir dire. See, e.g., United States v. Stone, No. 10-20123, 2012 U.S. Dist. LEXIS 4277, at *10 (E.D. Mich. Jan. 13, 2012).

The court will also permit the defendants to review, with appropriate redactions of personal identifiers, the extensive juror questionnaires that defense counsel have helped prepare. This will further ensure that the defendants are able to conduct an informed voir dire examination and effectively challenge the seating of individual jurors.

Finally, if the defendants so desire, the court will provide all prospective jurors with a neutral, non-prejudicial explanation for requiring anonymity, similar to those cited with approval by the Fourth Circuit in United States v. Hager, 721 F.3d 167 (4th Cir. 2013), and the Sixth Circuit in United States v. Talley, 164 F.3d 989 (6th Cir. 1999). See Hager, 721 F.3d at 188 ("[T]he district court told the panel that the reason they were identifying them by numbers in court, as opposed to by name, was 'to protect [them] from contact in the media or other persons, curiosity seekers and the like, to protect [them] from unwanted publicity and to insure that no outside information [was] communicated to [them] through th[e] process and the trial.'"); Talley, 164 F.3d at 1002 n.7 ("This case is one where there is likely to be a good bit . . . of media interest, because it is important to all of the parties that there not be any media contact with jurors . . . until this case is over, we are using your juror numbers during this process and at all times do not give me your names, do not give the parties your names, but always when you are addressing the court refer to your juror number. We did this for your benefit to make sure . . . that you are not bothered or approached by any media about this case or any aspect of it."). The court will also instruct the members of the jury panel that the fact that they are being identified

by number should have no impact on the presumption of innocence to which the defendants are entitled. See Hager, 721 F.3d at 188.

For all of these reasons, the court concludes that an anonymous jury is necessary in the instant case, and that reasonable steps can be taken to protect the defendants' rights. The government's motion will be granted in part and the court will empanel a semi-anonymous jury.

## Conclusion

For the reasons stated, the court will transfer venue to the Roanoke Division and empanel a semi-anonymous jury. Accordingly, Mersadies Shelton's oral motion to transfer venue to the Roanoke Division will be granted; Halisi Uhuru's motion to transfer venue to the Roanoke Division will be granted; Shantai Shelton's motion to transfer venue to the Roanoke Division will be granted; Kweli Uhuru's motion to transfer venue to the Richmond Division of the Eastern District will be denied; Daniel Mathis' motion in opposition to transferring venue to the Roanoke Division or, in the alternative, to transfer venue to the Richmond Division will be denied; Anthony Stokes' motion to transfer venue to the Richmond Division or, alternatively, to the Roanoke Division, will be granted in part and denied in part; and the government's motion for an anonymous jury will be granted in part.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 21st day of August, 2015.

/s/ Glen Conrad
Chief United States District Judge