CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 31, 2025

LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA

V.                                          NO. 3:14-CR-00016

SHANTAI MONIQUE SHELTON

DEFENDANT'S MOTION FOR APPOINTMENT OF COUNSEL

The Defendant, Shantai Monique Shelton, files this Motion for Appointment of Counsel, on the same day in which she files her pro se Motion for Compassionate Release or Sentence Reduction, pursuant to 18 USC Section 3582. In support of this Motion, the Defendant presents the following reasons that appointment of counsel is appropriate at this time:

1. This is a capital offense case. The Defendant is serving a life sentence. Due to the seriousness of the case, the age of the Defendant at the time of the offense, and her limited ability to present complex legal theories, appointment of counsel is appropriate.

2. This Court has appointed counsel in several cases similar to the present case. Please see, United States v. Tronco-Ramirez, No. 5:10-cr-028, November 6, 2024, granting sentence reduction; United States v. Stewart, No. 5:13-c4-00019, November 21, 2024, granting sentence reduction; and, United States v. Fields, No. 5:12-cr-00002, September 13, 2024, granting sentence reduction.

3. There are medical documents needed and witnesses which the Defendant would like to contact in support of her plea for compassionate release or a sentence reduction. The Defendant is unable to obtain medical documents and contact witnesses, without the assistance of counsel.

For the reasons stated, the Defendant prays the Court will grant appointment of counsel.

Respectfully Submitted,

Shantai Monique Shelton, Defendant
March 3 , 2025
FMC-Carswell
PO Box 27137
Ft. Worth, TX 76127

CERTIFICATE OF SERVICE

Service is performed by the electronic filing of this Motion by the U.S. District Clerk.

Shantai Monique Shelton, Defendant

For the reasons stated,

-------------------------------------------------------------------------------------------------

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA

V.                                          NO. 3:14-CR-00016

SHANTAI MONIQUE SHELTON

DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE OR SENTENCE REDUCTION

The Defendant, Shantai Monique Shelton, pro se, files her Motion for Compassionate Release or Sentence Reduction, pursuant to 18 USC Section 3582 and recent changes in the U.S. Sentencing Guidelines, Section 1B1.13. In support of relief, the Defendant presents the following:

I. RELEVANT CASE BACKGROUND

After a jury trial, in February 2016, the Defendant was convicted of multiple counts involving the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Section 1962(d), violent crimes in relation to racketeering activities (VICAR), 18 U.S.C. Section 1959, as well as witness tampering by means of murder in violation of 18 U.S.C. Section 1512(a). The Defendant was also convicted of Hobbs Act robberies in violation of 18 U.S.C. 1951(a), brandishing and/or discharging a weapon in violation of 18 U.S.C. Section 924(c).

The Defendant's convictions were affirmed on direct appeal, while the Section 924(c) were remanded for resentencing. See, United States v. Mathis, 932 F.3d 242 (4th Cir. 2019).

While on remand, the Court considered the First Step Act application to the Defendant. The sentence was reduced and affirmed on appeal.

This is the Defendant's first Motion for Compassionate Release.

II. JURISDICTION

Section 3582 requires that a defendant make a request for compassionate release to the warden. The Defendant made this request February 2, 2025. Exhibit-A, Request to Warden Rule. The 30-day waiting period has expired.

Section 2255 allows a petitioner to file their Motion within one-year of a circuit precedent being published. The Fourth Circuit Court of Appeals published United States v. Kinard, 93 F.4th 213 (4th Cir. 2024), in March 2024. The Court may decide some of the claims for compassionate release qualify for relief in a habeas corpus proceeding.

The Court has jurisdiction to grant relief in accordance with either statute.

III. DEFENDANT'S EXTRAORDINARY AND COMPELLING REASONS FOR GRANTING COMPASSIONATE RELEASE.

18 USC Section 3582 and USSC Section 1B1.13 allows a district court to grant compassionate release or a sentence reduction for several reasons. The Defendant presents her claims for relief as follows:

A. The Defendant's health is declining due to inadequate medical treatment, dangerous environmental conditions in federal prisons, and a lack of funding to make repairs to the prison, therefore qualifying her for compassionate relief, in accordance with Section 1B1.13(b)(1).

The Defendant suffers with Type-2 diabetes, dangerously high blood pressure, obesity, and respiratory illnesses. The Defendant's health has become progressively worse due to inadequate medical treatment, precarious environmental conditions, and a lack of funding to repair the dangerous conditions in the prison.

I

In United States v. Fleming, No. ELH-08-086, LEXIS 43421, (D. Maryland, March 11, 2022), the district court granted a sentence reduction, from life to 360 months, where the defendant's health worsened during his incarceration, due to poor management of his diabetes and obesity. The district court considered the Section 3553 factors, denying immediate release, due to the defendant's offense and his disciplinary record, but acknowledging some relief was appropriate.

At this time, the Defendant is suffering with high blood pressure requiring blood pressure checks three times a day. Health Service is not able to lower the Defendant's blood pressure because the prison does not have adequate funds to provide medications used by most Americans with high blood pressure. Add to this the conditions of overcrowding in the prison, which decrease funds to care for an aging prison population. This is emotionally detrimental of the Defendant. The Defendant's blood pressure is at stroke levels.

The Defendant's diabetes is another illness not adequately treated. The diet given to diabetics is poor. Every morning the Defendant is given high carbohydrate foods, which elevate her insulin levels, leaving her dizzy and sick.

Most of the inmate population is suffering with respiratory illness, to include those who never did drugs or smoked. The Federal Bureau of Prisons has no funding to repair the prison and/or perform preventive maintenance. There is toxic mold and friable asbestos at FMC-Carswell. No mold or asbestos remediation has been done.

One example is the failure of the prison to have the air ducts cleaned. There has never been air duct cleaning at this facility, a medical facility with hundreds of women suffering with Chronic Obstructive Pulmonary Disorder, chronic asthma, bronchitis, and other respiratory illnesses, such as toxic mold and friable asbestos, which are abundantly present at FMC-Carswell.

Health Services routinely fails to document inmate reporting of respiratory illnesses caused by the dangerous environmental conditions at Federal Medical Center-Carswell.

Section 1B1.1(b)(1) of the sentencing guidelines allow the Court to grant compassionate release where an inmate is not receiving adequate care and their medical condition is deteriorating. A review of the Defendant's medical records in the last 2-3 years, will prove her health is worsening.

The Defendant cannot foresee her health problems being resolved while in the custody of the FBOP. The Court does not have to wait to grant relief when the Defendant is nearly dead. Community placement would allow the Defendant to receive adequate care.

B. The Defendant is a victim of sexual abuse, where the FBOP has failed to protect women in their custody, which qualifies her for compassionate release, in accordance with 1B1.13(b)(4).

The FBOP has failed to protect women from sexual abuse. Throughout the Defendant's incarceration, at every FBOP facility where she has served her sentence, the Defendant has be sexually harassed and abused, by male officers and male inmates. While housed at FCI-Aliceville and FCI-Tallahassee, the Defendant was sexually abused and harassed by FBOP employees, who were later prosecuted for sexually abusing women in their custody. The Defendant feared retaliation and did not report the sexual abuse she suffered. She made herself content that these sex offenders were sent to prison.

Still, a review of news articles reporting on rampant sexual abuse of women in federal prisons, nationwide, along with the Court's knowledge of large numbers of victims not reporting rape, may assure the Court of the Defendant's credibility on the claim of her sexual abuse during incarceration. Exhibits- B to E .

The policies and practices of the FBOP have been an utter failure in protecting women from sexual abuse by their employees.

Another instance of sexual abuse is the Defendant is forced to shower with biological male inmates. These male inmates allege they are women, therefore, the FBOP has transferred them to women's federal prisons. The Court may verify the Defendant is presently housed with at least four biological male inmates, two of whom are child molesters and/or serial rapists of women and children, while another is a leader in the Aryan Brotherhood.

The Defendant is a member of the LGBT community. And, like a majority of women in prisons, has been a victim of sexual abuse prior to her incarceration. There is no hate or discrimination against transgender people in the Defendant's heart. There is fear of sexual assault while in the shower, by one of the male inmates.

Be that as it may, the Defendant is forced to share showers, toilet, and other intimate facilities with male inmates who have

sexually harassed her and other women.  The Special Housing Unit staff routinely locks women in the cells with male inmates. The women are forced to shower and use the toilet in the presence of male inmates.  Women are locked in these segregation cells for 24 hours a day.

Reporting sexual harassment and voyeurism(a Texas state crime, Penal Code 21.17), by these male inmates is ignored.  The FBOP employees do not want to be perceived as transphobic, so women are being sexually abused and denied protection from these menacing male sex offenders.

While the Defendant respects the individual rights of others, right now, the rights of the Defendant, a woman, to bodily privacy from male inmates, is sexual abuse.  90% or more of the male inmates transferred to FCI-Aliceville, FCI-Tallahassee, and FMC-Carswell are regularly having sex with female inmates.  Some women have become pregnant or have a sexually transmitted disease.

The U.S. Sentencing Commission allows the Court to grant compassionate release or a sentence reduction when allegations of sexual abuse are coobborated.  See, Section 1B1.13(6).  Recently, the President issued an executive order to remove biological male inmates from women's prison, admitting women were being harmed.

There is widespread reporting on women in state and federal prisons being sexually assaulted by biological males in women's prisons.  Reporting by various media outlets of sexual abuse of women by biological male inmates who identify as being women is attached.  Exhibits- F to K .

The Defendant has received no emotional support from Psychology Services for years of sexual abuse she has suffered.  The Defendant needs care in the community, for years of sexual abuse by the FBOP's transgender policy, as well as by FBOP employees.  The Court may review California Coalition for Women Prisoners v. United States, No. 23-cv-4155-YGR, (N.D. Cal. Feb. 2025), where there is a proposed consent decree addressing the rampant sexual abuse by a warden, chaplain, and many other FBOP employees.  FCI-Dublin is not unique.  The same sexual abuse is ongoing at FMC-Carswell.

The Defendant fears raising the issues of being forced to shower with male inmates because it is a highly political issue.  Still, it is important for the Court to be aware that while the Defendant is a liberally-minded person, she is being sexually degraded every time she takes a shower, with male inmates in the housing unit, child and women rapists, looking at her in the shower.

Years of sexual abuse warrant granting compassionate release.

C.  The Defendant qualifies for compassionate release or a sentence reduction, in accordance with, U.S. Sentencing Commission amendments to Section 1B1.13(b)(6), where there has been intervening changes in law, causing sentencing disparities?

First, the Court may consider the national average federal sentence for murder is about 22 years, as reported by the Sentencing Commission in 2022.  Statistical Information Packet, Fiscal Year 2022, Fourth Circuit.

The Defendant is serving an unusually long sentence.  The U.S. Sentencing Commission amended Section 1b1.13(b)(6), to allow district courts to reduce an unusually long sentence which causes a disparity in sentences.  Intervening changes in the law can qualify as being an extraordinary reason for compassionate release or a sentence reduction.

Burrage v. United States, 571 U.S. 204, was decided by the U.S. Supreme Court, in 2014.  However, the Fourth Circuit Court of Appeals did not consider Burrage's "but for" causation requirement until, United States v. Campbell, 903 F.3d 309, 316 (4th Cir. 2020), and only briefly.

In Fleming, cited above, decided in 2022, the district court cited Burrage, where the original sentencing judge had applied the murder cross-reference to the sentence and its application to the sentencing guidelines.

The Defendant raises Burrage because the "but-for" causation standard was never used to challenge the sufficiency of the evidence to convict the Defendant on VICAR, witness tampering, or Section 924(c), during trial or on direct appeal.

After the Defendant's convictions were affirmed in United States v. Mathis, 932 F.3d 242 (4th Cir. 2019), the Fourth Circuit published new case law precedents on the review of VICAR charges and the "purpose element."  See, United States v. Thomas, 87 F.4th 267 (4th Cir. 2023); United States v. Kinard, 93 F.4th 213 (4th Cir. 2024)(see concurrence by Senior Circuit Judge Keenan, citing Mathis, Thomas, and the Supreme Court's decision in Borden v. United States, 598 U.S. 420, 414 (2021)).

3

The Defendant's attorneys have never applied the "but for" causation requirements to this case, in any of their filings. This was a very complex case, therefore, the Defendant does not fault her attorneys. They fought hard for her.

Still, the Court my review the testimony in the case which proves the Defendant was not present when the murder occurred. There was no evidence presented meeting the "but for" causation requirement.

For these reasons, the Court may consider relief pursuant to 28 U.S.C. Section 2255.

The legal theories are very complex, worthy of professional briefing. The Defendant has filed a Motion for Appointment of Counsel, but will do her best to apply the current "purpose element" standard to the present case.

Applying Burrage, Thomas, and Kinard, the Government did not meet its burden to prove but-for causation or the purpose element of VICAR. The evidence presented was a robbery gone bad and the cover-up was worse than the initial offense.

The purpose element, under Borden, now requires that the murder be committed for the purpose of gaining entrance to or maintaining or increasing in the enterprise, "not that the defendant commit any act with that purpose that may have the unintended consequences of resulting in assault or murder." United States v. Manley, 52 F.4th 143, 152 (4th Cir. 2022).

At best, the Government presented evidence of "unintended consequences" which resulted in a murder, but the purpose element and but-for causation against the Defendant were not met under the present legal standard in the Fourth Circuit.

Applying the current case law, it is more than likely the Defendant is not guilty of the VICAR statue, Section 924(c), or witness tampering. And, in Campbell, the Fourth Circuit briefly addressed the "independent, sufficient cause death theory." In this case, as addressed in Burrage, the jury made no finding of multiply, sufficient causes, independently and concurrently causing death. Id. at 214-15, and Campbell at 316.

Because these are complicated legal theories which cause the best jurist to tussle mentally, between the facts of the case and case law precedents, the Defendant bows to the wisdom of the Court to consider appointing counsel to brief this issue pursuant to Section 3582 or Section 2255. These arguments can be consider actual innocent claims or extraordinary circumstances warranting relief.

IV.  THE SECTION 3553 FACTORS SUPPORT GRANTING RELIEF.

The Defendant has presented claims of sentence disparities warranting compassionate release or a sentence reduction. Despite the Defendant's life sentence, and health problems, she maintain a prison work assignment and engaged in substantial rehabilitative efforts. Exhibit-__L____, Defendant's FBOP Program Review. See, United States v. Rudsill, 834 Fed. Appx. 827, 829 (4th Cir. 2021)(holding the district court abused its discretion by not addressing the defendant's post-sentencing conduct). For the last year, the Defendant has not had any incident reports.

Because the Defendant is serving a life sentence, she is on wait lists for several classes. The women's federal prisons do not offer as many programming opportunities as men's federal prisons. Any classes or treatment which was available, the Defendant has taken. However, because the Defendant has a life sentence, inmates with lower sentences are always placed before her.

If granted compassionate release, and placed at a halfway house, the Defendant would have access to mental health treatment, spiritual advisors, and educational programming. At this time, the FBOP does not offer even one computer class. This is egregious in 2025.

There is no doubt, nor words, to express the remorse of the Defendant. There is no more serious offense than the crime of being associated with a murder. The Defendant takes responsibility for not living the life God intended for her to live.

The Defendant is unlikely to ever re-offend. Her FBOP likelihood of recidivism score, otherwise known as PATTERN Score, is the lowest possible, minimum. Exhibit- _M___, FBOP PATTERN Score Document. Based on the DOJ-FBOP's own calculations, the Defendant has the best chances of being an asset to her family and community.

H

---

Due to the harsh, lockdown conditions during the midst of a global pandemic, which did not prevent the Defendant from contracting the COVID-19 virus, at least twice, many courts have granted sentence reductions. See, United States v. Park, 456 F.Supp.2d 357 (S.D.N.Y. 2020)(noting that a sentence "that was sufficient but no greater than necessary, may now, in light of COVID-19, become one immeasurably greater than necessary."). The Defendant was in custody for the entire pandemic, lockdown for over 2 years.

The Plaintiff has medical and mental health needs which can best be addressed with community placement. If compassionate release is granted, the Defendant would ask the Court to modify the conditions of her supervised release, to include 18 months at a halfway house, possibly in North Carolina.

It is the Defendant's release plan to utilize the re-entry resources at the halfway house, which would include assistance in finding a job, mental health counseling, housing, and medical care in the community. The Defendant is asking the Court to bless her with a fresh start, in a different community, standing on her own two feet.

The Defendant will conclude this Section by listing several cases where young offenders were granted mercy by thoughtful, deep-thinking district judges, as follows: United States v. Smith, No. SAG-96-086 (D. Md., July 30, 2024)(500 month sentence for murder reduced to 360 months); United States v. Wing, No. CR-05-88-GF-BMM-1 (D. Mont., Nov. 8, 2024)(first degree murder sentence of life, reduced to time served); United States v. Nugent, No. 91-559-02-CKK (D. Columbia, Oct. 3, 2024)(life sentence for murder reduced to time served); United States v. Taylor, No. 03-80029-Scola (S.D. Fla., May 13, 2024)(reduced from life to 360 months); United States v. Adley, No. 03-20678-CR-ALTONAGA (S.D. Fla., May 3, 2024)(reduction of 118 months from 387 months).

The reasoning in United States v. Taylor, No. CCB-02-0410 (D. Md., July 7, 2023) lead several district courts to reduce life sentences for murder. The district court wrote an opinion which touched the heart of the Defendant, addressing the severity of the crimes, while recognizing the man Mr. Taylor is today, and has the opportunity to be even greater, in his community.

The "Taylor Opinion" brought tears of remorse and relief to the Defendant's soul. No one can go back, yet there is a future for the Defendant. The Defendant prays to have children and to give back to her community.

CONCLUSION

The Defendant thanks the Court for considering the merits of the claims presented. The Defendant prays the Court will grant Compassionate Release or a Sentence Reduction.

Respectfully Submitted,

Shantai Monique Shelton, Defendant
Reg. 18414-084
March 3 2025
FMC-Carswell, 2-North
PO Box 27137
Ft. Worth, TX 76127

CERTIFICATE OF SERVICE

Service is performed by the electronic filing of this Motion by the U.S. District Clerk.

Shantai Monique Shelton, Defendant

5

TRULINCS  18414084 - SHELTON, SHANTAI MONIQUE - Unit: CRW-I-N

----------------------------------------------------------------------------------------------

FROM: Warden
TO: 18414084
SUBJECT: RE:***Inmate to Staff Message***
DATE: 02/03/2025 03:37:02 PM

Good Afternoon, Ms. Shelton.

Your request has been noted. The Social Work Department coordinates all compassionate release requests at FMC Carswell. Please email your request to the Social Work Department. A Social Worker will request additional information from you and schedule you for an appointment related to your request.

I hope you find this information helpful.


From: ~^! SHELTON, ~^!SHANTAI MONIQUE <18414084@inmatemessage.com>
Sent: Sunday, February 2, 2025 2:55 PM
Subject: ***Request to Staff*** SHELTON, SHANTAI, Reg# 18414084, CRW-I-N

To: Rule
Inmate Work Assignment: Laundry

I would like to submit my request for compassionate release. I have been subjected to sexual abuse,sexual harassment, inhumane living conditions, and an unusually long sentence. I'm a minimum recidivism, clear conduct, actively program, and i have kept a job my entire incarceration. Thank you for your consideration.

EX-A

---

SUBJECT: ARTICLE ON CARSWELL, SEX , REPORT TO
DATE: 02/12/2025 03:18:24 PM

-----Institute, Cato on 2/12/2025 3:06 PM wrote:

>

hey how are you? here are the details you requested. https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims - Sexual abuse a `severe problem` at Fort Worth`s Carswell prison, attorneys for 2 women say | KERA News

Search QueryShow Search
TEXAS NEWS
HEALTH & WELLNESS
EDUCATION
POLITICS
ARTS & CULTURE

KERA Arts
ARTS ACCESS
Go See DFW
KERA Arts
ARTS ACCESS
Go See DFW
NEWSLETTERS

WAKE UP with KERA News
KERA News Weekday Update Newsletter Signup
WAKE UP with KERA News
KERA News Weekday Update Newsletter Signup
2025 LEGISLATIVE SESSION
ABOUT

RADIO SCHEDULE
KERA STAFF
CONTACT
CAREERS
RADIO SCHEDULE
KERA STAFF
CONTACT
CAREERS
© 2025 KERA News
Menu

NPR for North Texas
Show Search
Search Query
Donate

EX-B-1

Play Live Radio
Next Up:
0:00
0:00
0:00 0:00

SUBJECT: ARTICLE ON CARSWELL, SEX , REPORT TO
DATE: 02/12/2025 03:18:24 PM

-----Institute, Cato on 2/12/2025 3:06 PM wrote:

>

hey how are you? here are the details you requested. https://www.keranews.org/criminal-justice/2024-03-11/fort-worth-carswell-sexual-abuse-federal-prison-2-victims - Sexual abuse a `severe problem` at Fort Worth`s Carswell prison, attorneys for 2 women say | KERA News

Search QueryShow Search
TEXAS NEWS
HEALTH & WELLNESS
EDUCATION
POLITICS
ARTS & CULTURE

KERA Arts
ARTS ACCESS
Go See DFW
KERA Arts
ARTS ACCESS
Go See DFW
NEWSLETTERS

WAKE UP with KERA News
KERA News Weekday Update Newsletter Signup
WAKE UP with KERA News
KERA News Weekday Update Newsletter Signup
2025 LEGISLATIVE SESSION
ABOUT

RADIO SCHEDULE
KERA STAFF
CONTACT
CAREERS
RADIO SCHEDULE
KERA STAFF
CONTACT
CAREERS
© 2025 KERA News
Menu

NPR for North Texas
Show Search
Search Query
Donate

Play Live Radio
Next Up:
0:00
0:00
0:00 0:00

EX-B-1

---

The two suits are not the only instances of sexual abuse at Carswell. An investigation by the Fort Worth Star-Telegram found a pattern of abuse and cover-ups, among the worst of any facility across the U.S.

"We filed a second lawsuit, just a couple days ago on behalf of Jane Doe, not only just to get compensation for her injuries but, more importantly, to call awareness to this severe problem at the Carswell medical unit in Fort Worth," said Randall Kallinen, a Houston-based civil rights attorney.

While incarcerated in 2021, Doe said Nix took her to areas of the prison without cameras, such as a supply closet, where he would rape her, according to a complaint filed with a federal judge in Fort Worth.

Nix resigned from the Federal Bureau of Prisons in 2021, according to court documents. Doe was released from Carswell in 2022.

Marci Marie Simmons with Lioness Justice, a Texas advocacy group for present and former incarcerated women, said for every reported sexual abuse case, there are several more that go unreported.

"When a woman incarcerated reports sexual misconduct by staff, they immediately separate her from population, so she's placed in solitary confinement," Simmons said about why women don't report sexual abuse. "Oftentimes that breaks communication that she might have with her family or children on the outside."

Simmons said Lioness Justice plans to spread awareness about sexual abuse in federal prisons, including Carswell. She said Kallinen contacted the nonprofit to give insight into what Doe and others may have faced on a day-to-day basis during their incarceration.

She said when he contacted the organization about Doe's case, it was not a surprise.

"It's very similar to what most of us have experienced," Simmons said. "It's kind of a culture of coverup, `I have my coworker's back` kind of situation."

While Nix is named in Doe's lawsuit, Kallinen said others likely saw the suspicious behavior and should have reported it.

"What we're trying to do is to call attention to this. Because, of course, one way to discourage this kind of behavior is prompt and serious punishment for these kinds of activities," he said. "But also, there needs to be policies put into place to prevent this."

Got a tip? Email Megan Cardona at mcardona@kera.org.

KERA News is made possible through the generosity of our members. If you find this reporting valuable, consider making a tax-deductible gift today. Thank you!

Tags
Criminal Justice prisonCourts & Criminal Justicesexual abuse & assaultBureau of Prisons
Facebook
Twitter
LinkedIn
Email

Megan Cardona
Megan Cardona is a daily news reporter for KERA News. She was born and raised in the Dallas-Fort Worth area and previously worked at the Fort Worth Star-Telegram.
See stories by Megan Cardona

The best stories from KERA sent to your inbox.
SUBSCRIBE

Stay Connected
instagram
youtube
facebook
© 2025 KERA News
KERA
Kids and Family
KERA Arts
Tellyspotting
KXT 91.7
Privacy Policy
Terms of Use
Contact Us

EX-B-2

2

--------------------------------------------------------------------------------

SUBJECT: ALICEVILLE OFFICER PROSECUTED
DATE: 02/12/2025 03:16:18 PM

-----Institute, Cato on 2/12/2025 3:06 PM wrote:

>

hey how are you? here are the details you requested. https://www.wvtm13.com/article/prison-officer-arrest-aliceville-inmate-abuse-alabama/60888145 - Former Federal Bureau of Prisons officer sentenced following sexual abuse of Aliceville inmateSkip to content NOWCAST WVTM 13 Midday Newscast Watch on Demand
Menu
Search
Homepage
Local News
National News
Weather
Live Doppler
Politics
Alerts
Hurricanes
Traffic
Sports
High School Huddle
Investigate
Upload Content to WVTM 13
News We Love
Project CommUNITY
Get the Facts
Matter of Fact
Entertainment
Forecasting Our Future
Very Local
News Team
Titan TV Guide
Contact
Editorials
MeTV
Advertise with WVTM13
Contests
Privacy Notice
Terms of Use
 SUBSCRIBE TO EMAIL
 Weather

Search

 Press enter to search Type to Search
Search location by ZIP code -
ZIP
Advertisement
Former Federal Bureau of Prisons officer sentenced following sexual abuse of Aliceville inmate
Share Copy Link
Copy
 to copy.
Link copied!  Updated: 6:16 PM CDT May 23, 2024

EX-C-1

Former Federal Bureau of Prisons officer sentenced following sexual abuse of Aliceville inmate
Share Copy Link
Copy
 to copy
Link copied! Updated: 6:16 PM CDT May 23, 2024
Riley Conlon Digital Producer

EX-C-2

A former corrections officer with the Federal Bureau of Prisons has been sentenced following the sexual abuse of an Alabama inmate.Back in January, FBOP Officer Robert Smith, 39, pleaded guilty to sexually abusing an inmate while he was working at the Federal Correctional Institution in Aliceville, according to the U.S. Department of Justice.Court documents and evidence presented during his sentencing allege that in or around February 2019, Smith engaged in sexual activities with a female inmate in his office in the facilities department.Smith also admitted to engaging in sexual activities with another female inmate the year prior, this time in the prison's locked mechanical room, which he accessed using a key."Beyond the view of the cameras and the eyes of potential witnesses, this defendant sexually abused and assaulted vulnerable women inmates and thought he would get away with his crimes," said Assistant Attorney General Kristen Clarke of the Justice Department's Civil Rights Division. "This case should send an unequivocal message to officials working in correctional settings that we have zero tolerance for sexual assaults of women held inside jails and prisons. We encourage the survivors of these heinous crimes to report acts of official misconduct and violence to the FBI. The Justice Department will continue to aggressively prosecute those who violate the civil and constitutional rights of people detained in correctional facilities."On Thursday, Smith was sentenced to two years in prison followed by 15 years of supervised release.>> WVTM 13 ON-THE-GO: Download our app for free"Robert Smith has been held to account for abusing his position of trust by sexually assaulting an adult in his custody," said Deputy Attorney General Lisa Monaco. "Today's sentence marks the latest step forward in the Justice Department's ongoing campaign to root out sexual misconduct from the Federal Bureau of Prisons. The Department will continue to hold accountable any BOP employee who violates their oath to protect those in their care through sexual assault."
ALICEVILLE, Ala.

A former corrections officer with the Federal Bureau of Prisons has been sentenced following the sexual abuse of an Alabama inmate.

Back in January, FBOP Officer Robert Smith, 39, pleaded guilty to sexually abusing an inmate while he was working at the Federal Correctional Institution in Aliceville, according to the U.S. Department of Justice.

Court documents and evidence presented during his sentencing allege that in or around February 2019, Smith engaged in sexual activities with a female inmate in his office in the facilities department.
 Former ADOC lieutenant who assaulted inmate sentenced in federal civil rights case
Smith also admitted to engaging in sexual activities with another female inmate the year prior, this time in the prison's locked mechanical room, which he accessed using a key.

"Beyond the view of the cameras and the eyes of potential witnesses, this defendant sexually abused and assaulted vulnerable women inmates and thought he would get away with his crimes," said Assistant Attorney General Kristen Clarke of the Justice Department's Civil Rights Division. "This case should send an unequivocal message to officials working in correctional settings that we have zero tolerance for sexual assaults of women held inside jails and prisons. We encourage the survivors of these heinous crimes to report acts of official misconduct and violence to the FBI. The Justice Department will continue to aggressively prosecute those who violate the civil and constitutional rights of people detained in correctional facilities."
On Thursday, Smith was sentenced to two years in prison followed by 15 years of supervised release.

"Robert Smith has been held to account for abusing his position of trust by sexually assaulting an adult in his custody," said Deputy Attorney General Lisa Monaco. "Today's sentence marks the latest step forward in the Justice Department's ongoing campaign to root out sexual misconduct from the Federal Bureau of Prisons. The Department will continue to hold accountable any BOP employee who violates their oath to protect those in their care through sexual assault."

2

SUBJECT: STORY ON ALICEVILLE MISTREATMENT
DATE: 02/12/2025 03:15:48 PM

-----Institute, Cato on 2/12/2025 3:06 PM wrote:

>

hey how are you? here are the details you requested. https://www.ktvu.com/news/lawyers-horrified-conditions-fci-dublin-transfers-alabama-prison - Lawyers `horrified` at conditions for FCI Dublin transfers at Alabama prison | KTVU FOX 2
Live
News
Weather
Sports
FOX Local
Contests
More
Watch Live
Expand / Collapse search
?
Search site
News
Local
National
Crime
2024 Election
Drought
Wildfires
Business
Consumer
Web Links
West Coast Wrap
FOX News Sunday
Mornings
Zip Trips
Traffic
Contests
Recipes
Weather
Weather Alerts
Live Bay Area Weather Cameras
Air Quality Map
Wildfires
Earthquakes
Severe Weather
Weather App
FOX Weather
Sports
San Francisco 49ers
Golden State Warriors
San Francisco Giants
Oakland A`s
San Jose Sharks
Oakland Roots
USFL
FIFA Women`s World Cup

EX-D-1

Investigations
California EDD
Homelessness
Cost of California
Powerless In Prison
Unleashed Force: Power and Police Dogs
Specials
California's Electric Revolution
The Four
High Stakes: Sports Betting in California
Made in the Bay
Powerless In Prison
Sports Focus
Talk of the Town
This Is Me: Transgender Journeys
Unleashed Force: Power and Police Dogs
Voices For Change
West Coast Wrap
Zip Trips
Brand Spotlight
Money
Personal Finance
The Economy
Small Business
Regional News
Los Angeles News - FOX 11
Phoenix News - FOX 10 Phoenix
Seattle News - FOX 13 Seattle
About Us
How To Stream
KTVU Staff
Jobs and Careers
Contact KTVU
FOX Shows and Programming
KTVU's Schedule
Live News Stream Schedule
Mobile Apps
Subscribe To KTVU's Newsletter
FCC Public File
FCC Applications
High Wind Watch
from WED 10:00 PM PST until FRI 10:00 AM PST, East Bay Interior Valleys, San Francisco Peninsula Coast, Coastal North Bay including Point Reyes National Seashore, Northern Monterey Bay, North Bay interior valleys, Santa Cruz Mountains, Santa Clara Valley including San Jose, San Francisco Bay Shoreline, San Francisco County, Santa Lucia Mountains and Los Padres National Forest

Lawyers 'horrified' at conditions for FCI Dublin transfers at Alabama prison
By Lisa Fernandez
Updated November 19, 2024 12:40pm PST
Dublin prison
KTVU FOX 2
Share
Copy Link
Email
Facebook
Twitter
LinkedIn
Reddit

EX-D-2

2

Powerless in Prison: The fallout of FCI Dublin

In April, the Bureau of Prisons abruptly shut down the troubled FCI Dublin. KTVU interviews dozens of women and explains what led up to the closure, questioning whether this was retaliation for outside oversight over the prison, which has been riddled with sex abuse for decades.

OAKLAND, Calif. - Two Bay Area lawyers have been trying to visit the 600 women who are now in federal prisons across the country after the Federal Correctional Institute at Dublin shut down this spring.

"And we were pretty horrified by what we heard and saw," said Susan Beaty, one of the lawyers who filed a class action lawsuit against the Bureau of Prisons in the wake of the sex scandal at the now-shuttered women's prison in Dublin.

Beaty was specifically speaking about her visit, along with co-counsel Kara Janssen, to FCI Aliceville, a low-security prison with about 1,500 incarcerated women in Pickens County, Alabama, last month.

"It reaffirmed for us that many of the really serious abuses that happened at Dublin were not just because of something specific to Dublin or because of bad actors at Dublin, but due to deep systemic issues in the Bureau of Prisons," Beaty said.

She said that after speaking to 60 women in Alabama, dozens of women told her and Janssen that they continue to face retaliation by FCI Aliceville staff for having come from Dublin and for speaking out against the staff misconduct there   including seven officers being convicted of sex crimes; an eighth is headed to trial   which ultimately led to the abrupt closure of FCI Dublin in April.

"We talked to multiple women who allege that they were raped and sexually assaulted by Aliceville guards in the last one to two years, and in at least one case the guard was allowed to continue working at the prison for months after sexual assault allegations were made," Beaty said. "It honestly felt like being at Dublin, you know, prior to the implosion."

The Bureau of Prisons refused to say how many employees are on leave or under investigation.

However, at least two officers have been sentenced for sex crimes in the last five years, according to the Department of Justice. Eric Todd Ellis was sentenced to 18 months in prison for having sex in the laundry room with an incarcerated woman in 2020 and Robert Smith was sentenced to 24 months in prison for engaging in sex acts with an incarcerated woman in 2019, and another woman in 2018.

In a lengthy statement to KTVU this week, BOP spokesman Benjamin O`Cone did say that the Bureau of Prisons "strongly condemns all forms of sexually abusive behavior and takes seriously our duty to protect the individuals entrusted in our custody. Actions threatening the safety and integrity of our institutions will not be tolerated. We are resolute in our mission to foster a humane and secure environment, protecting both our employees and incarcerated individuals from any form of sexual harassment and assault."

O`Cone pointed out that earlier this year, the BOP, the Department of Justice - Office of Inspector General and other "law enforcement partners"  conducted an "interagency operation designed to achieve our shared goal of maintaining a safe environment for both our employees and the incarcerated individuals housed at FCI Aliceville."

O`Cone said that this operation meant "gathering intelligence to better understand the current environment at FCI Aliceville." He explained that this included "mass interviews" of the women, a "thorough review of existing investigations, and an evaluation of the intelligence gathered."

In addition, O`Cone said that the BOP conducted "comprehensive training to reinforce best practices and ensure they are fully equipped to handle any issues that arise."

But none of these words ring true for Beaty or Janssen, who have now visited FCI Dublin transfers at SeaTac in Seattle and FCI Waseca in Minnesota, where the women have told them stories about being put into isolation for relatively minor offenses and not receiving mental health services. Women in federal detention in Miami complain they have no access to direct sunlight.

"It was really disheartening for me and for my colleague," Beaty said. "You know, we`ve both spent a lot of time in a lot of prisons and talked to, at this point, dozens and dozens of people who`ve suffered sexual abuse by prison staff. And despite that, I think this was one of our hardest visits yet."

Beaty said that the "same patterns, the same playbooks" are playing out, where women who were abused come forward, they`re not believed and then they are put in solitary confinement as retaliation, while the officers being accused keep working and then assaulting other women.

As for what can be done, Beaty said she and her legal team continue to write reports for Special Master Wendy Still, who has oversight over the plaintiffs in the lawsuit, at least until December, though her powers are limited because the complaints are now being lodged from prisons across the country and she is physically located in Alameda County.

Beaty and Jannsen said they filed a report of their concerns about FCI Aliceville under seal to the U.S. District Court in Northern California.

Beaty also said that the lawyers are trying to connect their clients with resources and advocacy groups in Alabama and other cities where the women are incarcerated. And Beaty said that she hopes that members of Congress hold the BOP accountable for how they are treating people in their custody.

"You know, the same tools of punishment and silencing are being used by staff at Aliceville and other institutions that were used in Dublin," Beaty said. "What happened in Dublin was horrific. But I think it is important that we understand that Dublin was not an aberration, that Dublin was not a one-off, that these same patterns are happening in other facilities and in other prisons."

Lisa Fernandez is a reporter for KTVU. Email Lisa at lisa.fernandez@fox.com or call her at 510-874-0139. Or follow her on Twitter @ljfernandez

3                EX-D-3

www.dailymuck.com
October 2024

SUBJECT: 'Rape Club' Prison's Legacy Continues to Haunt in Criminal, Civil Trials  Even the Warden Was Involved
DATE: 02/18/2025 09:06:05 PM

Gone but not forgotten.

How can anyone forget the years of sexual assault, rape, humiliation and terror that the staff of the infamous Dublin, Calif. federal women's prison inflicted on its unfortunate residents?

Seven employees of Federal Correctional Institution (FCI) Dublin  a low-security prison  have been convicted or pled guilty to charges of sexual abuse of inmates in the past few years. No doubt their wrists are still stinging from the feather-light punishment they received.

One of the "Dublin 8" has pled not guilty and awaits trial. He is Darrell Wayne "Dirty Dick" Smith, whose case was featured in The Daily Muck on Aug. 26. He is set for trial in March 2025.

Smith could face two life sentences if convicted and sentenced to maximum penalties for aggravated sexual abuse and deprivation of civil rights, according to a Justice Department press release. He also faces six counts of sexual abuse and seven counts of abusive sexual contact.

While Smith is the only criminal case known to be pending involving the recently-closed "Rape Club" federal prison, there are numerous civil suits filed against the Bureau of Prisons (BOP) and staff members alleging years of sexual abuse of women prisoners. One is a class action suit involving eight inmates.

The Dublin 8

The DOJ often puts the "maximum penalty" in its press releases when announcing an arrest, indictment or conviction/guilty plea. It gives a "tough on crime" impression. Sentences are usually handed down a month or two later. Those press releases don't remind readers what the "maximum" sentences could've been and are almost always significantly lighter.

For those wondering what happened to the first seven members of the Dublin 8, you may want to sit down and make sure you are not holding a hot beverage in your hand before reading further. As noted in a June 11 motion in the pending class action lawsuit, these are the sentences handed down so far, listed in order of sentence length:

Food Supervisor Andrew Jones. Pled guilty to six counts of sexually abusing an inmate and one count of making false statements. SENTENCE  96 months (8 years).

Prison Chaplain James Highhouse. Pled guilty to two counts of sexual abuse, two counts of abusive sexual contact, and one count of making false statements. SENTENCE  7 years.

Officer Nakie Nunley. Pled guilty to four counts of sexual abuse, five counts of abusive sexual contact, and one count of making false statements. SENTENCE  6 years.

Warden Ray Garcia. Convicted of three counts of sexual abuse, four counts of abusive sexual contact, and one count of making false statements. SENTENCE  5 yrs., 10 mos.

Safety Manager John Bellhouse. Convicted of two counts of sexual abuse and three counts of abusive sexual conduct. SENTENCE  5 yrs., 3 mos.

Prison Cook Enrique Chavez. Pled guilty to one count of abusive sexual contact. SENTENCE  1yr., 8 mos.

Recycling Technician Ross Klinger. Pled guilty to three counts of sexual abuse. SENTENCE  one year of home confinement (time served) in exchange for cooperating with the government.

You read that correctly: so far, no one has received more than an eight-year sentence even after admitting to sexually abusing multiple vulnerable women in their charge at FCI Dublin. The charges against these seven men were far fewer than the number of allegations against them. Believe it or not, some were charged with fewer incidents than they admitted to committing.

Crimes and No Punishment

This is not a sequel to Doestevsky's masterpiece but a statement of fact. The alleged abuse, up to and including what would be defined as rape under the law outside the walls of a prison, made it into the government's motions and summaries but never came before a jury or judge to determine guilt and penalties for those crimes.

Even the warden was involved. And not just in covering up the scandal but as an active participant in the crimes.

Garcia's Criminal Case

While FCI Dublin has a long history of sex scandals, its final path to oblivion began with Warden Ray Garcia's reign of abuse from late 2019 to mid-2021.

Garcia was arrested in September 2021, convicted in December 2022 and sentenced on March 22, 2023. In a March 23 update to the initial press release, the U.S. Attorney for Northern California announced Garcia would serve 70 months in prison for sexually abusing three female inmates and lying to federal investigators.

The offenses occurred while Garcia was employed as associate warden and then warden of the women's prison.

"The defendant in this case abused his authority as a warden and violated his oath to protect those in the custody of the Bureau of Prisons," Deputy Attorney General Lisa O. Monaco said at the time. "The sentence he received today is another step forward in our ongoing efforts to root out sexual misconduct within the BOP."

U.S. Attorney Ismail J. Ramsey said the "evidence in this case paints a disturbing picture of a former warden who abused the

1                                    EX-E-1

trust placed in him, as well as authority granted to him, all while thinking he could get away with his crimes by lying to investigators and intimidating his victims."

"Rather than ensuring that female inmates at the Dublin prison were safe and secure, Garcia used his position as warden to sexually abuse three inmates over multiple years, intimidated inmates and lied to cover up his crimes, and created a heinous culture that failed to protect female inmates from widespread sexual abuse and violence at the hands of other Dublin employees," DOJ Inspector General Michael E. Horowitz noted.

He said putting Garcia in prison for just shy of six years holds him "accountable for his disgraceful actions and sends a clear message to every BOP employee about the serious consequences of engaging in such conduct."

Garcia Told Victims He Could 'Never Be Fired'

The government reported in a March 8, 2023, sentencing memorandum that Garcia would discourage his victims from reporting his actions by telling them he was "friends with the person in charge of investigating sexual abuse of inmates" and that he could "never be fired."

The DOJ press release said Garcia "created and perpetuated a culture of abuse" at the prison.

The "making false statements" charge was based on Garcia's assertion in July 2021 that he "never asked inmates to be undressed for him and that he had never touched an inmate inappropriately. Trial evidence showed that Garcia had already asked multiple inmates to undress for him and had also touched Victim 1, Victim 2 and Victim 3 in a sexual manner."

In addition to the offenses for which he was convicted, former FCI Dublin warden Ray Garcia had committed the same or worse on other inmates. He also told his victims that if they reported him, he wouldn't be punished, but they would, the memorandum stated.

The seven other women who spoke to authorities included two who testified in court.

Specific Crimes

One inmate said Garcia made sexual comments and told her to strip for him. She said she felt she couldn't say no because Garcia could ruin her life in prison.

Another woman said she was lifting weights when Garcia grabbed her butt cheek. He told her, "I couldn't help myself." When he saw her running on the track, he asked her to slow down because he liked to "see it jiggle, wiggle."

Two who did not testify in court gave accounts that closely matched those of the other victims. They both said he flattered them and complimented them at first and then began telling them to strip naked for him. One woman said she felt uncomfortable but was afraid she would be sent to solitary confinement if she refused.

Garcia gave one inmate jewelry for letting him take nude photos of her and having her strip for him.. His relationship with this inmate was more intense than the others, who only had to endure an occasional probing finger. This woman said they had oral, vaginal and anal sex multiple times in the prison.

Another prisoner said Garcia asked to take a picture of her, made inappropriate comments and told her to "spend time" with him in a supply closet if she wanted help with an administrative request. She said she went into the closet with Garcia twice, where he would grope her and force her to perform oral sex on him while he forcefully pushed her head down.

The last inmate said Garcia put his fingers in her twice and used her hand to stroke his penis.

Give Garcia More Time

Federal judges use sentencing guidelines that consider the severity of the crime, the offender's previous criminal record and other factors before handing down the penalty. The U.S. Sentencing Commission upgraded the offense level for sexual abuse of an inmate on Nov. 1, 2023, saying stiffer penalties were needed to punish the crimes and deter future misbehavior, according to the latest version of the Sentencing Guidelines.

Judges retain the discretion to impose sentences less than the recommended sentencing range or higher based on the circumstances of individual cases.

After reviewing the relevant factors, the sentencing recommendation for Garcia of 46 to 57 months was made on March 1, 2023, according to the DOJ's March 8 motion seeking a harsher sentence.

The prosecutors pointed out that in addition to the charges involving the three women in the criminal case, the government had two additional victims who testified at trial and five non-testifying victims who gave statements "to detail Garcia's abuse."

Some of the acts the other seven inmates allege are more serious than those for which Garcia was charged and convicted.

The motion said Garcia's crimes "were extraordinarily serious. Because the advisory guidelines' range fails to account for the seriousness of Garcia's crimes, the government respectfully moves this court to vary or depart upward and impose a sentence of 180 months in prison, a supervised release term of 15 years, a $20,000 fine, and $800 in special assessments."

"While this is a significant upward variance or departure from the Guidelines, it is a necessary one," the U.S. Attorney's Office added.

As noted, Garcia was ordered to serve 70 months in prison  less than half of what prosecutors deemed a more appropriate sentence but two years longer than the minimum recommendation. Garcia was also ordered to pay a $15,000 fine and have 15 years of supervised release after his prison sentence concludes.

He is serving his sentence in Iowa State Penitentiary.

Prosecutors Argued for Upward Adjustment to Sentence

The government attorneys even used another Dublin 8 case to support their argument, noting that Highhouse  the chaplain

2                    EX-E-2

pled guilty to abusing one inmate. He admitted to two counts of sexual abuse, two counts of abusive sexual contact, and one count of lying to investigators about those incidents.

The sentencing recommendation was 24 to 30 months. Prosecutors were so outraged that a chaplain would use his position to abuse a female inmate on numerous occasions that they pointed out during sentencing that there was also evidence he had sex with another inmate and made inappropriate sexual remarks to other inmates.

The judge eventually sentenced Highhouse to 84 months in prison based on "the systematic nature of the conduct, the length of time that the conduct occurred, the number of instances of abuse, sexual assault and rape, the involvement of multiple victims who were also inmates at Dublin and were subjected to the same sort of abuse," the DOJ recounted.

The motion argued that Garcia's abuse "was systematic and far-ranging." The warden "had almost limitless power at FCI Dublin, and he used that power to subject the 10 women who have come forward to horrifying abuse."

They said Highhouse's sentence was about three times the length of the recommended sentence due to the aggravating circumstances of his abuse, and their request for a 180-month sentence for Garcia would be "roughly three times the advisory Guidelines in this case, would not create an unwarranted sentencing disparity, and is substantively reasonable."

Note that federal courts impose a minimum mandatory sentence of five years in prison for the possession of 500 grams of cocaine and a minimum mandatory 10-year sentence for manufacturing as little as 50 grams of methamphetamine..

But shouldn't violent sexual criminals get more time than those who commit nonviolent crimes?

Not according to the federal sentencing guidelines.



3

## Civil Suits Pile Up

When the criminal courts fail to provide justice, the civil courts may be able to provide at least some compensation for the victims. However, many of those end up being suits against only the individual perpetrator due to the U.S. government's "sovereign immunity" from most lawsuits.

Keeping up with the number of lawsuits against the BOP and former FCI Dublin staff is like shooting at a moving target. A recent internet search found the latest estimate at over 60 civil lawsuits.

This article looks at the class action lawsuit and one specifically focusing on Garcia's actions. The basic allegations in these dozens of lawsuits are similar   only the names of offenders and victims change.

Claims include forced sexual acts, demanding women strip for the officers and pose for pornographic photos and threatening inmates with solitary confinement and/or loss of privileges if they refuse to do as ordered.

They say a "fish rots from the head down," and that appears to have been the case at DCI Dublin, where Garcia was the "head" of the completely rotten prison that earned its nickname of the "Rape Club."

## M.F.L.'s Lawsuit

One of the individual lawsuits was filed July 3, 2024, by a victim in Garcia's criminal case, identified as "M.F.L." Garcia was convicted of sexual abuse and sexual contact in December 2022. The lawsuit details much more prevalent and serious acts by Garcia on this inmate and others.

The basic argument of the suit is that Garcia "exploited his position and power to stalk, sexually harass, assault, and sexually abuse at least 10 individuals who were incarcerated at FCI Dublin."

M.F.L. said that while incarcerated at Dublin in 2021, she was "sexually harassed, abused, and assaulted by Defendant Garcia on repeat occasions" and "suffered her sexual abuse in silence, lest she was retaliated against or deprived of the modest privileges she had as incarcerated individuals."

The abuse ended only because Garcia was put on administrative leave in July 2021. He was charged in September 2021 with sexually abusing an inmate.

The suit says Garcia "used FCI Dublin as his playground, systematically grooming, manipulating and preying upon powerless victims." It recounts the judge and prosecutor remarking that Garcia's actions "not only injured his direct victims but also set the tone for the rest of FCI Dublin."

The suit points out that not only have seven of Garcia's subordinates been charged with sexually abusing inmates, but 14 others have been placed under investigation for sexual misconduct.

"Under Garcia's leadership, FCI Dublin became a cesspool of sexual abuse," the suit asserts.

## Promoted Instead of Prosecuted

M.F.L.'s attorneys note that even though there were suspicions and allegations of Garcia's abuse of inmates, he was promoted from associate warden to warden in November 2020 rather than prosecuted as a sexual predator.

"With the willful ignorance and tacit approval of his colleagues, Defendant Garcia continued his predatory reign on FCI Dublin, leaving countless victims in his wake, including the Plaintiff," the lawsuit states.

Specific allegations of Garcia's abuse of M.F..L. describe that from March to July 2021, Garcia groomed her with flattery and promises of compassionate release and then escalated to making her strip naked when he did his rounds, pose for nude photos and look at pictures of his penis.

"Garcia's visits to M.F.L.'s cell to demand sexual favors became so frequent that other BOP personnel, as well as prisoners, took notice," the lawsuit states. "Yet nothing was done to stop his assaults from escalating further."

Another strong condemnation in the lawsuit is that Garcia "demonstrated by his behavior that sexual abuse was acceptable. Many officers at FCI Dublin interpreted Garcia's behavior as carte blanche to do with the prisoners as they pleased. Sexual abuse, sexual assault, and sexual harassment ran rampant throughout the facility, and Garcia implied by his conduct that the perpetrators would not be punished."

Those women who filed a complaint alleging sexual abuse were sent to the Special Housing Unit during the "investigation" of their allegations. He would even send the inmate's cellmates to SHU during that "investigation."

The SHU refers to the Special Housing Unit   a seemingly innocuous term that really means punitive solitary confinement.

This happened to M.F.L. when one of her cellmates was "accused" of having a sexual relationship with a corrections officer. Although inmates cannot legally consent to sex, and any fault in such a relationship rests on the officer, the suit notes that the complainant, M..F.L. and their other cellmate were placed in SHU and treated as though they were being disciplined.

"From this experience, M.F.L. learned that collective punishment would result if her interactions with Garcia became known to others," the suit notes. "M.F.L. recalls that sexual harassment by Defendant Garcia became more frequent and noticeable after she was released from the SHU around June 2020 and was placed in a different cell than before."

## The Pandemic Made It Worse

The suit further alleges that when the prison was put into lockdown in March 2020 due to the COVID pandemic, "Garcia's

4        EX–E–4

sexual abuse further escalated." The lockdown gave Garcia more control over the movements of staff and inmates, allowing him "to isolate, terrorize and abuse his victims at will."

Garcia allegedly told people "he would never lift the lockdown as long as he was at FCI Dublin because, with it, he could move as he pleased."

Even after Garcia had been removed from the facility, the lawsuit states M.F.L. "felt overwhelmed, ashamed and uncertain regarding how to process her victimization by Garcia. She began having thoughts of committing suicide by overdosing on pills. As is common for victims of sexual abuse, she blamed herself for having fallen prey to Garcia's manipulation."

She was released in July 2022. She found out Garcia had denied her compassionate leave request in July 2021 but never told her because he continued to use it as leverage to gain sexual favors.

The suit contends the woman still "suffers from depression, daily intrusive thoughts regarding sexual abuse, sleep difficulties, low self-esteem, feelings of worthlessness and helplessness, and sexual distress that negatively affects intimacy with her partner."

On Oct. 1, 2023, she was hospitalized following a suicide attempt. The hospital reported she had severe PTSD symptoms.

Revolving Door

When Garcia was finally placed on administrative leave under investigation for his crimes in July 2021, Dublin FCI apparently installed a revolving door in the warden's office. T. Ray Hinkle was interim warden until Thahesa Jusino was appointed in March 2022. When Jusino retired in late 2023, Art Dulgov took the helm of the troubled prison. He was removed in March 2024 over allegations he and staff had retaliated against an inmate who testified in a federal court hearing about sexual abuse at the prison.

Nancy T. McKinney was tapped as interim warden and served in that capacity until the prison was ordered to be closed in mid-April. It was completely vacated by May 1.

Doors Are Closed; Case Is Still Open

Though FCI Dublin has closed for good, the civil cases are multiplying, and criminal ones might, too.

U.S. District Judge Yvonne Gonzalez Rogers, who is adjudicating the class action suit against the prison, has made clear that the BOP will not avoid consequences by simply closing the Dublin women's facility. On Sept.. 5, Rogers denied the BOP's motion to dismiss the class action lawsuit.

"The BOP asserts, in a cursory, one-page declaration, both that it does not intend to re-open FCI Dublin, at least in the short-term, and that its other facilities are now providing the FCI Dublin adults in custody (AICs) with adequate care," Rogers wrote. "In other words, the BOP's position is that all is now well, and continued intervention is unnecessary.

"The Court is not so easily persuaded," she wrote in her opinion. "The notion that the constitutional injuries alleged by FCI Dublin's AICs were comprehensively remedied by the facility's closure strains credulity. Redressable injuries stemming from the AICs' experiences at FCI Dublin remain to be addressed, and the BOP is well aware of this fact."

The judge reminded the lawsuit defendants that she "has previously taken and continues to take steps to safeguard class members by requiring the BOP to address medical, mental health, programmatic, administrative and other failures arising out of class members' experiences at FCI Dublin." She claimed these efforts are measured, tied directly to the allegations in the complaint and are proper under the law.

"Thus, having carefully considered the briefing, pleadings, and oral argument at the hearing on August 2, 2024, and for the reasons set forth below, the BOP's motion to dismiss and request for a stay of discovery are DENIED," Rogers asserted. Rogers told both sides to prepare for a jury trial on June 23, 2025.

Class Action Allegations

While many inmates seek individual compensation for their abuse at the hands of their captors, one group of inmates has obtained status as a class to represent all who endured life at "Rape Club Prison." We will not list individual allegations of abuse but will look at the overall justification for the class action lawsuit filed in the U..S. District Court for Northern California.

The suit was filed in August 2023, several months before the chain of events that led to the prison's abrupt closure on May 1, so the attorneys' comments about the prison are in present tense rather than past tense..

As noted previously, the government argued the problem no longer existed because the prison was closed. The judge disagreed and set a trial date of June 23, 2025.

The eight inmates' attorneys said their clients and "class members they represent" endured "horrific abuse and exploitation at the hands of facility staff, including but not limited to: rape and sexual assault; manipulation and sexual coercion, including officers entering into relationships with incarcerated individuals and officers forcing incarcerated individuals to undress in order to be released from cells or for exchange of goods; degrading sexual comments; voyeurism and taking and sharing explicit photos; drugging, groping, and other forms of abuse during medical exams; and targeted abuse towards immigrants under threat of deportation."

The plaintiffs seek to make the BOP a party to the suit by alleging it "has been aware of these problems for decades and has failed, and continues to fail, to take action to protect those in its care by preventing and addressing rampant staff sexual misconduct."

The suit alleges that "staff protect their abusive colleagues by failing to investigate claims or respond meaningfully, and by retaliating against those who report abuse." Inmates "have no way to safely report sexual misconduct. Survivors must frequently report to the same staff members who abused them or who allowed the abuse to occur."



When victims have attempted to send reports directly to the DOJ via a "confidential" email system, "they must do so on public computers in full view of staff and other incarcerated persons. Those reports are often, in turn, sent back to FCI Dublin officials. As a result, survivors frequently face immediate retaliation, including placement in solitary confinement, repeated and unjustified strip and cell searches, and transfer to other facilities away from their families and support systems.
"This pervasive retaliation deters many survivors from reporting their abuse," the suit notes.

EX-E-6

6

## Rogers' 'Valentine' to Dublin Officials

Just a few months after he became warden, Art Dulgov received a "valentine" from the judge   an unannounced visit on Feb. 14, during which she spoke privately to about 100 inmates outside of the presence of any BOP staff.

A few weeks later, FBI agents armed with a search warrant swept through the prison. By the end of the day, Dulgov, Associate Warden Patrick Deveney and two other prison officials had been dismissed.

This was, as the Legal Information Services Assistance (LISA) Foundation reported in its March 14 newsletter, believed to be linked to the suspected retaliation against inmate Rhonda Fleming, who testified in a January 2024 hearing. Shortly after that hearing, Fleming was sent to "solitary confinement" for allegedly possessing contraband   two screws   which she said were planted by guards as a pretense to punish her for her testimony.

Fleming staged a seven-day hunger strike to protest her isolation and the deplorable living conditions in the SHU cell and was transferred to another prison facility.

## Fleming Shines Light on Retaliation

There were 13 incarcerated women who testified in early January that "changes" prison officials said had been implemented at Dublin "failed to stop ongoing harassment, abuse and retaliation," the LISA report noted.

Rogers criticized prison officials for putting inmates who reported sexual harassment and abuse in "protective custody" in the Special Housing Unit (SHU)   the same area where inmates being disciplined for an infraction are placed.

In response to excuses that solitary confinement was not meant to be a punishment, Rogers said, "It's hard to say it's not punitive when you're restricted to an hour, maybe an hour and 15 (minutes) outside, which is vastly different from general population."

"You're treating them just like someone who is being disciplined, which suggests it's punitive," the judge added.

Rogers issued an order forbidding any of the 13 witnesses to be transferred. However, that did not stop officials from sending Fleming to the SHU as a "security threat."

In a February 2024 article, the California Coalition of Women Prisoners, who represents the eight women in the class action lawsuit, noted that in defiance of Rogers' order forbidding the transfer of the witnesses, Fleming was sent to the Metropolitan Detention Center in Los Angeles on Feb. 6. A court document containing Fleming's statement of events says the disciplinary charges were dismissed due to lack of evidence and she was returned to Dublin on Feb. 16.

Fleming alleges "Officer Ferguson" (no first name given) said he and "Lt. Baudizzon" (no first name) were against sending her to the SHU. Warden Dulgov and Assistant Wadren Delveney told them Fleming "had to be placed under investigation and put into the SHU and to 'find something and that's an order.'"

Ferguson and Baudizzon went through Fleming's emails, viewed surveillance videos of family visits and monitored phone calls but found no rules violations to justify sending her to SHU. She was sent to the unit anyway and ultimately transferred to MDC-Los Angeles.

## It Does Not Please the Court

BOP and DOJ officials got an earful from the judge when she was informed her orders had been intentionally disobeyed.

In a Feb. 15 court order, Rogers said she learned of Fleming's transfer shortly before her Valentine's Day visit to the prison. She told federal attorneys for the BOP that she would hold a hearing on Feb. 27 "for the government to show cause why it should not be held in contempt or sanctioned for failure to abide by the court's order.. A response shall be filed within 48 hours of this order."

Strangely enough (maybe not so strangely), Fleming was sent back to Dublin on Feb. 16 and cleared of any disciplinary infraction. However, she still feared   and faced   retaliation.

Fleming told the California Coalition that she was ordered to report to the health clinic for an exam, even though she had just had one at MDC-LA.

"Aside from one camera at the entrance, the clinic has no other surveillance cameras   and Fleming knew women who had been sexually assaulted there," the Coalition states in its article. Fleming said her instinct "told me not to go anywhere with these people," so she repeatedly refused to be examined.

She was initially refused any fresh clothing when she came back from Los Angeles, but was finally given a set of clothes after she threatened to tell the judge and attorneys.

## Rogers Orders Repairs

In a Feb.. 16 order to prison officials, Rogers said she spent nine hours at the prison and its adjacent satellite camp on Feb. 14, with most of that time "spent talking to inmates the court approached randomly and in confidence."

She said her "first-hand communication will prove critical to resolving the pending motions" and ordered that several physical camp deficiencies be addressed. The judge found four showers at the satellite camp were out of service. The other four had no hot water.

"The fact that inmates have only cold showers available is unacceptable, particularly because it is the middle of winter. BOP is

---------------------------------------------------------------------------------------------

ORDERED to resolve this issue IMMEDIATELY," Judge Rogers wrote in her order.

She gave the warden until Feb. 20 to verify that all four working showers had hot water and that the four out-of-service showers would be repaired and have hot water by the end of February.

The judge also ordered licensed contractors to inspect the camp for gas leaks, black mold and asbestos "AS SOON AS POSSIBLE but no later than Friday, February 23, 2024."

Rogers said the main prison had complied with an order to issue inmates two blankets, but that had not been done in the satellite camp. She ordered that the second blanket be issued to camp inmates "today, Friday, February 16, 2024" and to confirm by Feb. 20 that it had been done.

Rogers appointed a special master to oversee the problems at Dublin. In April, the BOP decided to close the prison and transfer 600 inmates to other facilities across the country.

A Gaping Loophole in Need of Closing

In all, seven FCI Dublin employees have been sentenced for crimes related to sex abuse, while another awaits sentencing. None of the sentences meted out have exceeded eight years, leaving observers to wonder why the sentences haven't been longer.

A December 2022 report of the Permanent Subcommittee on Investigations discussed what can only be described as a gaping loophole for predatory prison personnel to avoid consequences for their sexual crimes.

The report states that a 1967 court case ruled that "when a government employer forces an employee to answer questions under oath as a condition of employment, that interview is considered 'compelled,' and any inculpatory statements made by the employee during that interview cannot be used against him in a subsequent criminal prosecution.

"In other words," the report continues, "if a BOP employee admits to sexual misconduct in a compelled interview, statements made during that interview cannot be used against him in a criminal prosecution by OIG or any other law enforcement entity."

The report said that to pursue criminal charges against a BOP employee who admitted to the crime in a compelled interview, prosecutors "would have to show that it had reasons to pursue criminal charges independent from anything disclosed" in that interview and nothing in that interview could be used as evidence in the case. The practical effect is that if (the BOP employee) can be compelled, it's a get out of jail free card."

No More 'Get Out of Jail Free Cards'?

The report includes "compelled statements" from personnel at the Coleman Correctional Complex in Wildwood, Fla. The Office of Internal Affairs (OIA) "received complaints of sexual misconduct by at least six officers." The cases were sent to the Office of Inspector General, but that agency "declined to investigate and referred the cases back to BOP OIA to handle administratively.

"BOP OIA compelled each of these officers to sit for interviews," the report continues, "In those interviews, the officers made sweeping admissions to misconduct, making subsequent criminal prosecution difficult."

The report includes four of those typed and initialed admissions.

"After reviewing affidavits in these cases in response to the Subcommittee's request, OIG told the Subcommittee in a briefing: 'There is no world in which we can say this is a good outcome. These individuals knew they have been compelled and could retire and resign and spill to (BOP) OIA and basically have immunity in some cases for engaging in sexual activity with multiple inmates. It is a terrible outcome.'"

The BOP Inspector General has "recently reformed its complaint screening practices to mitigate the risk of overlooking widespread sexual abuse in a BOP facility by employees again," the report states. "Although OIA provided the FCC Coleman allegations to OIG on multiple occasions, OIG is also considering a written memorandum with OIA to memorialize BOP OIA's current practice, such that BOP OIA would have an affirmative, written responsibility to inform OIG of new evidence uncovered during OIA's administrative investigation" prior to the "compelled interview."

The report indicates this "could support a criminal investigation."

In one of the only positive comments in the report, the subcommittee notes the OIG "has taken steps to institute reforms to address the potential difficulties in investigating sexual abuse of female prisoners. OIG has prioritized investigations of sexual misconduct cases, sought additional resources to be able to investigate a higher percentage of sexual misconduct allegations it receives, required its SACs (special agent in charge) to specifically note whether they had determined if the subject of an incoming complaint had previously been accused of misconduct, and is proactively analyzing case information in its database to identify 'hot spots' by individual and institution."

The subcommittee interviewed Dublin's former warden, Wiley Jenkins   Garcia's predecessor   and asked him if Dublin had a "culture of abuse," as the several criminal prosecutions of employees might indicate. Jenkins answered, "No."

"In his view, sex abuse by BOP employees at FCI Dublin did not reflect broader issues at the prison," the report stated. "His remedy for BOP employee sexual abuse of female prisoners at the scale of FCI Dublin would be the same as his remedy for a one-off case of sexual abuse.

"'It goes back to individual choices of people making poor decisions,' he said." the report added.

Will Things Get Better?

There are those who dare to hope these crimes and the media attention they have received will improve the conditions in our federal prisons and prevent more victims.

Some see the recently enacted Federal Prisons Oversight Act as a light of hope at the end of this dark tunnel. Cynics might say that light is the headlight of a federal freight train, running on the same tracks it has always traveled, still on the same course

8                                        EX- E- 8

and hell-bent on running over anything that gets in its way..

President Biden signed the bipartisan act into law on July 25 in what a Senate press release called "historic prison reform legislation to overhaul independent oversight of the Federal Bureau of Prison's 122 facilities nationwide by mandating routine inspections of all facilities by the DOJ Inspector General and establishing a new Ombudsman to investigate the health, safety, welfare, and rights of incarcerated people and staff."

Sen. Jon Ossoff (D-Georgia), a sponsor of the bill, said, "The human rights crisis behind bars in the United States is a stain on America's conscience," and Congress "will no longer tolerate the ongoing and widespread abuse of those who are in Federal Bureau of Prisons' custody."

So does that mean this may be the last article you will ever read about the sexual abuse of inmates by prison officials? Sadly, probably not.

EX-E-9

9

EX-F-1

----------------------------------------------------------------------------------------------------

SUBJECT: LISA Newsletter for February 3, 2025   BOP Transgender Policy Changing (Or Not)
DATE: 02/02/2025 08:21:03 PM

LISA publishes a free newsletter sent to inmate subscribers in the Federal system. Due to BOP Corrlinks limitations, the newsletter must be sent in small batches throughout the week.

Edited by Thomas L Root, MA JD

Vol 11, No 5

<><>

Girls Will Be Boys and Boys Will Be Girls

<><>

GIRLS WILL BE BOYS AND BOYS WILL BE GIRLS

Despite facing Bureau of Prisons policies that required placement of biological males in federal women's prisons if the males identified as female, prisoner Peggy Pfennig (a biological female) has climbed the litigation mountain that frustrates almost every inmate who tries to scale it: she went to trial in ND Florida federal court over a claim that her constitutional right to bodily privacy was violated by the BOP's transgender policy of sending inmates equipped with male genitals to women's prisons.

Peggy argued that placing biological men in their housing units compelled women to expose themselves to males in shower and toilet facilities. The BOP countered that the showers had individual stalls and curtains for privacy, but Peggy argued that the curtains were so filthy that no one wanted to touch them.

Anyone familiar with the Dept of Justice Inspector General's inspection of FCI Tallahassee last year would find Peggy's allegation completely believable.

No matter. On Jan 17, the judge ruled that Peggy had not proven her case, holding "that BOP policy and practice is to prohibit such exposure and to provide Plaintiff and other inmates with numerous means to protect their bodily privacy [They] are required to shower, use the toilet, and change their clothes in individual stalls separated by walls and covered by curtains, and they are permitted to choose the times they shower."

Peggy lost but just for a minute. Three days after the decision, incoming President Trump issued an executive order directing the Attorney General to "ensure that males are not detained in women's prisons "

So Peggy won. But that may just be for a minute, too. Last Thursday, a Massachusetts federal court issued a temporary restraining order on behalf of an unnamed trans male-to-female inmate ordering the BOP not to move him to a male prison or deny him access to transitioning drugs and surgery.

The plaintiff claimed his impending transfer to a men's prison violates the 8th Amendment prohibition against cruel and unusual punishment and deprives him of transitioning healthcare in violation of the Rehabilitation Act of 1973.

At the same time, three trans male-to-female federal prisoners sued last Thursday in Washington DC to block Trump's order. Their attorneys said they had all been placed in the SHU in preparation for transfer to a male prison but had later been returned to general population, although they have been warned they still face imminent transfer.

The complaint argues Trump's order was driven by "hostility towards transgender people.."

Last week, the BOP reported having 1,529 male prisoners claiming to be trans females and 744 female prisoners claiming to be trans males. That information, however, was purged from the BOP website last Friday.

In 2017, the BOP issued a policy permitting "housing by gender identity when appropriate." A year and a half later, the Dept of



Justice modified the policy to "use biological sex as the initial determination" of placement but still permitted gender identity-based placement in rare cases."

In 2022, the Biden DOJ updated the BOP's policy yet again to eliminate biological sex altogether as the initial determinant of placement in a men's or women's prison. Instead, the "Transgender Executive Council," was to consider factors including the male inmate's "security level, criminal and behavioral/disciplinary history [and] current gender expression" as well as medical needs and vulnerability to victimization.

The principal omission from the transgender calculus has always been the safety of other women prisoners. Instead, the primary concern was "mitigating risk" to the trans-identifying inmate.

A Free Press article last week argued that "since the policies went into place, there have been multiple reports of sexual assault by male trans-identifying inmates toward female inmates. One woman who sued Rikers Island jail in New York in 2020, alleged that, after arriving in her cell, a male inmate introduced himself by saying, "I'm not transgender. I'm straight. I like women," before raping her. Another woman claimed she was raped in the prison shower by her 6-foot-2-inch, 200 lb bearded male attacker. In 2022, a trans-identifying male in a New Jersey women's prison impregnated two prisoners."

Order Following Bench Trial (ECF 176), Fleming v Pistro, Case No 4:21-cv-325 (Jan 17, 2025)

Defending Women from Gender Ideology and Extremism and Restoring Biological Truth to the Federal Government (Jan 20)

The Free Press, Biden's Transgender Prison Policy Goes to Trial (Jan 13)

NBC News, Federal judge blocks Trump administration from transferring transgender inmate (Jan 31)

Reuters, Transgender inmate sues over Trump's order curtailing LGBT rights (Jan 27)

WUSA-TV, Transgender inmates sue to block Trump order that would force move to men's prison (Jan 31)

AP, Health Data and Entire Web Pages are Wiped from Federal Websites (Jan 31)

--------------------------------------------------------------------------------

SUBJECT: Tremaine Carroll
DATE: 02/13/2025 09:36:04 PM

CHOWCHILLA, Calif. -- A convicted criminal who served time at the women's prison in Chowchilla, California is charged with raping fellow inmates.

A Madera County judge ruled 52-year-old state prisoner Tremaine Carroll must be referred to with she/her pronouns because Carroll identifies as a woman.

But the district attorney believes the defendant is abusing the system.

"This is a person who is not a woman in any sense of the word," says Madera County District Attorney Sally Moreno.

In March DA Sally Moreno, charged Carroll for rape allegedly committed while incarcerated at the Central California Women's Facility in Chowchilla.

"After his first cellmate became pregnant and was moved to Los Angeles, two other cellmates of his had complained that he had raped them, so we have filed rape charges against this inmate," said Moreno.

Moreno says the ruling regarding pronouns impacts her ability to prosecute the case.

"This is a particular issue in this case because it's confusing to the jury. In California, rape is a crime that has to be accomplished by a man," said Moreno.

Supervising Deputy District Attorney Eric Dutemple says it's also unfair to the victims.

"Its just absolutely insane that a victim would have to get on the stand and police their pronoun usage when trying to recite one of the scariest times of their lives," said Dutemple.

Carroll was allowed to serve time in a women's prison despite being a biological male because of Senate Bill 132, The Transgender Respect, Agency and Dignity Act, which took effect in 2021.

It allows inmates to be housed with the gender they identify as.

"There's no psychological evaluation that needs to be done. This person does not need to be on cross gender hormones, they don't need to be signed up for transgender surgery, they don't need to be a psychological evaluation regarding gender confusion, the mere statement is enough," said Moreno.

Carroll has since been relocated to Salinas Valley State Prison for men.

The CDCR sent Action News a statement about the case, writing:

CDCR is committed to providing a safe, humane, respectful and rehabilitative environment for all incarcerated people. Senate Bill 132, The Transgender Respect, Agency and Dignity Act, became effective on January 1, 2021. It allows incarcerated transgender, non-binary and intersex people to request to be housed and searched in a manner consistent with their gender identity. CDCR reviews every request to be transferred under Senate Bill 132 to determine whether that move, based on the individual's case factors, would present a safety and management concern. At all our institutions, CDCR thoroughly investigates all allegations of sexual abuse, sexual misconduct, and sexual harassment pursuant to our zero-tolerance policy and as mandated by the federal Prison Rape Elimination Act. CDCR does not comment on cases in litigation.

Moreno says Carroll fired the defense attorney handling the case and has chosen to move forward with self-representation in court.

Carroll's next court date is set for January 14th.
Report a correction or typo
Copyright © 2025 KFSN-TV. All Rights Reserved.

EX-G-1

By Abigail Shrier
March 26, 2019

The Equality Act sacrifices female safety in restrooms, locker rooms and even domestic-violence shelters.

It has become rightly fashionable to ridicule the idea of "safe spaces," places where adults can hide and sulk like children avoiding ideas they find threatening. But women need actual safe spaces not from intellectual challenge, of course, but from physical threat of harm from men. As a biological matter, most women are physically outmatched by men. Men are stronger and faster than we are, though we're better able to tolerate pain and tend to live longer.

House Democrats introduced a bill this month that would outlaw safe spaces for women. The Equality Act so called because, to put it charitably, Democrats excel at branding purports merely to extend protections of the Civil Rights Act of 1964 to people who are gay and transgender. Insofar as it would prohibit landlords from evicting tenants and employers from firing employees based on sexual orientation, it is no doubt long overdue.

But the bill goes further, proposing to prohibit discrimination based on "gender identity." That claim directly competes with the rights of women and girls. Any biological males who self-identify as females would, under the Equality Act, be legally entitled to enter women's restrooms, locker rooms and protective facilities such as battered-women's shelters. This would put women and girls at immediate physical risk.

Because courts typically interpret Title IX of the Education Amendments of 1972 according to the provisions of the Civil Rights Act of 1964, amending the latter would alter the understanding of the former. Biological boys who identify as girls would gain an instant entitlement to compete on girls' teams in all 50 states. No more democratic discussion of accommodation, competing interest, sacrifice and fairness. No more debate about whether we should really allow girls' scholarships and trophies to go to male athletes who were unable to excel on the boys' teams. No more discussion about whether it's right to allow, as we have, biological men to pick off championships in women's and girls' powerlifting, cycling, wrestling and running. These emergent public discussions would be locked away in a vault of civil rights.

Part of the reason women have been reluctant to object to these incursions into their hard-won rights has to do with embarrassment at acknowledging our biological differences, which some leading feminists have denied for years. But women are biologically different from men, as the chromosomes in every cell of our bodies readily testify. (How absurd that this is necessary to point out.) And one source of many of our physical differences resides in our glands.

Boys undergo a testosterone surge during puberty that is 10 to 40 times what girls experience, conferring lifetime physical advantages: vastly greater muscle mass, bone density, more fast-twitch muscle fiber, larger hearts and lungs all things that provide absolute and unbridgeable advantage in strength and speed.

As long as women had their own safe spaces, such disadvantages never mattered much.. But that may soon change. Not because women and men have changed, but because of the progressive left's sudden rush to strip girls and women of separate facilities, sacrificing their rights to a group a notch or two higher on the intersectional pecking order.. As Kara Dansky, media director of the Women's Liberation Front, put it to me, the Equality Act would eliminate "women and girls as a coherent legal category worthy of civil-rights protection." It would do so by redefining the category of "women" to include "women and those who say they are women" which means women and people who aren't women at all.

Activists typically counter this argument with the claim that men wouldn't pose as men-who-believe-they-are-women unless they sincerely believed it. There are too many taboos, and the transgender life is too hard for anyone to want to fake it, they claim. But under the Equality Act, pretending to be transgender would sometimes be rational.

It doesn't strain the human imagination to picture a male convict renaming himself "Sheila" and heading for the women's prison. Nor would it surprise anyone if rapists began to "identify" as women no physical alteration is required to change your gender identity to gain free access to women's showers. What pedophile wouldn't want open access to girls' bathrooms? And many a biological man with no place to sleep would prefer the quieter, gentler confines of a shelter for battered women to the dodgy enclosure of one for homeless men.

EX- H 1

Are there sincere transgender people who ought to be accommodated with appropriate facilities? Of course. But their need, however real, doesn't justify the immediate transfer of the hard-won rights of women and girls. No comparable sacrifice is asked of boys and men, who are unlikely to feel threatened by a biological woman in the restroom. No top male athletes are likely to lose competitions to biological women competing as men. Only women are made to sacrifice for the sake of this new "equality." And what women and girls are being coerced to cough up isn't an unfair privilege but a leveler they require. The bill is unlikely to become law while Republicans control the Senate or White House. But this isn't the first time the Democrats have introduced the Equality Act, and it won't be the last. It's a proposal worth taking seriously because it provides a glimpse of the left's willingness to sacrifice women and girls to those wolves in sheep's clothing transgender or not who would take advantage of them.

EX-H-2

Z

---

SUBJECT: ARTICLE ON MOZZY CLARK
DATE: 02/18/2025 06:44:29 AM

-----Institute, Cato on 12/31/2024 1:06 PM wrote:

>

hey how are you? here are the details you requested. https://nypost.com/2024/12/29/us-news/transgender-inmate-sexually-assaulted-cellmate-at-womens-prison-suit/ - Transgender inmate sexually assaulted cellmate at women's prison: suitPrimary Menu Sections

US News
Metro
Long Island
Politics
World News
Page Six
Sports
NFL
MLB
Olympics
NBA
NHL
College Football
College Basketball
WNBA
Post Sports+
Sports Betting
Business
Personal Finance
Opinion
Entertainment
TV
Movies
Music
Celebrities
Awards
Theater
Shopping
Lifestyle
Weird But True
Sex & Relationships
Viral Trends
Human Interest
Parenting
Fashion & Beauty
Food & Drink
Travel
Health
Wellness
Fitness
Health Care
Medicine
Men's Health
Women's Health

EX— I — 1

Jared Downing.  NY POST

Published Dec. 29, 2024, 4:42 p.m. ET

A former inmate at a Washington state women's prison was repeatedly sexually assaulted by her hulking transgender cellmate who was transferred to the prison after changing her gender identity, according to a shocking new lawsuit.
Mozzy Clark sued the state department of corrections in federal court last week for locking her in a cell with a 6-foot-4 convicted child molester who allegedly subjected her to months of stalking, threats of violence and sexual harassment and assault, according to the lawsuit.

The cellmate, Christopher Scott Williams, was convicted of sexually assaulting a young girl as a male, and was serving a separate sentence for domestic abuse.

Christopher Williams, who identifies as a transgender woman, is accused of sexually assaulting their female cellmate after being transferred to a women's prison. Obtained by NY Post
Williams then petitioned to be recognized as female and be transferred to a women's prison, according to the lawsuit.
When the state granted the request and placed Williams in a cell with Clark, the latter's life became a living nightmare, she alleged.
State DOC records show Williams is listed as female at the Washington Corrections Center for Women.
Explore More

Polar vortex headed for US will bring `exceptionally cold` temps in the new year: `Weather models are screaming`

Son fatally shot by dad while protecting pregnant fiancée on Christmas Eve   mom reveals hero's final words

UnitedHealth Group CEO quietly telling execs company will smash financial records: report

Clark claimed Williams, who slept above her in the top bunk, would threaten to rape her, leer at her in the shower, and constantly ask for sex   once with a homemade dildo he had brought into the cell, according to the lawsuit.

"In their cell, Ms. Clark was on the bottom bunk. Mr. Williams   would hover menacingly over Ms. Clark's bunk with an erection while touching himself. He would also display his erection to Ms. Clark against her will, and gesture towards it, saying how much he wanted her," the lawsuit alleged.

"One night, Ms. Clark woke up and saw inmate Williams sitting on the floor next to her bed with his arm under her blanket, rubbing her genitals," the lawsuit adds.

Clark said the guards did little to protect her when she complained. Eventually Williams was moved to a separate cell, but the inmate would seek her out, stare at her in the showers, and follow her into the bathroom   making perverted comments from the next stall, the documents alleged.

Keep up with today's most important news
Stay up on the very latest with Evening Update.
Thanks for signing up!
Enter your email address
Please provide a valid email address.

By clicking above you agree to the Terms of Use and Privacy Policy.
Never miss a story. Check out more newsletters
"He also started threatening her with violence if she complained about him again," according to the suit, which is asking for restitution from the state for "extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear."

Clark isn't the only woman who claims to have suffered abuse at the hands of Williams.

In August, another inmate alleged lewd, intimidating behavior by Williams and other transgender inmates held in the Washington Corrections Center for Women in an interview with the National Review.
"A bunch of women, when they're in the showers, these people are just standing there. They don't have to stand on their tippytoes and they look over and see everything. People were so uncomfortable. You feel kind of like you've been violated," the unnamed prisoner said.

2     EX-I-2

SUBJECT: MALE INMATE IMPREGNATES 2 WOMEN
DATE: 02/18/2025.06:41:32 AM


-----Institute, Cato on 12/30/2024 6:51 PM wrote:

>

hey how are you? here are the details you requested. https://www.nbcnews.com/nbc-out/out-news/nj-trans-prisoner-impregnated-2-inmates-transferred-mens-facility-rcna38947 - IE 11 is not supported. For an optimal experience visit our site on another browser.
Skip to ContentPolitics
U.S. News
Local
New York
Los Angeles
Chicago
Dallas-Fort Worth
Philadelphia
Washington, D.C.
Boston
Bay Area
South Florida
San Diego
Connecticut
World
Business
Sports
Editors' picks
Shopping
Tipline
Health
Culture & Trends
Science

Share & Save

My NewsManage ProfileEmail PreferencesSign Out

Search

Profile
 My NewsSign Out
 Sign InCreate your free profile
Sections
U.S. News
Decision 2024
Politics
World
Business
Sports
Investigations
Culture & Trends
Health
Science
Tech & Media

$EX - J - 1$

Latest Stories
Politics
U.S. News
World
Business
Sports
Editors' picks
Shopping
Tipline
Health
Culture & Trends
Science

OUT News
N.J. trans prisoner who impregnated 2 inmates transferred to men's facility
Demi Minor, 27, has been transferred from New Jersey's only women's prison to the vulnerable housing unit at a men's facility.
The Edna Mahan Correctional Facility for Women in Clinton, N.J.Seth Wenig / AP file

July 19, 2022, 6:17 PM UTC
By Tat Bellamy-Walker
A transgender inmate has been transferred out of the only women's prison in New Jersey after impregnating two female inmates.
Demi Minor, 27, has been moved to the vulnerable housing unit at the Garden State Youth Correctional Facility, a prison for young adults ages 18 to 30, according to Dan Sperrazza, a New Jersey Department of Corrections spokesman.
Sperazza confirmed there are three trans women housed in the youth facility's vulnerable housing unit, though the prison's general population houses only men.
Minor's removal from the Edna Mahan Correctional Facility for Women comes just a year after the state reached a settlement with the American Civil Liberties Union of New Jersey to house transgender inmates according to their gender identity, instead of their sex assigned at birth. The facility currently houses 27 transgender inmates, NJ Advance Media reported.
Sperrazza said "decisions related to an incarcerated person's housing are made within the parameters of the settlement agreement which requires consideration of gender identity and the health and safety of the individual."
The ACLU of New Jersey did not provide a response to NBC News' requests for comment regarding Minor's prison transfer.
Minor, who is serving a 30-year prison sentence for manslaughter, impregnated the fellow inmates earlier this year following consensual sexual relationships, Sperrazza confirmed. He added that even consensual sex between inmates is prohibited in the state.
Last year, two inmates at Edna Mahan filed a lawsuit "challenging the state policy and practice of housing some pre-gender confirmation surgery transgender women," adding that it violates their constitutional rights, according to court documents.
In a letter from Minor posted to the blog Justice 4 Demi, which often publishes videos and letters from her, she described her removal from Edna Mahan as punishment for having sex with two women.
"As a woman who is transgender I truly fear what lies ahead for me, its clear that staff have looked for some kind of security reason to kick me out of the only female correctional facility," Minor wrote in the post, which was published Friday. "They have thrown me to the wolfs and expected for me just gave up, I am baffled and disgusted by this use power and I can only ask that the commissioner and governors office please send me back. I don't deserve to be treated like this."
In a separate post published July 5, the blog alleged a group of correctional officers beat Minor in a van while transferring her. The Department of Corrections said an investigation determined the assault allegations to be unfounded.
"The Department has zero tolerance for abuse, and the safety and security of the incarcerated population and staff are of critical importance," Sperrazza said in an email. "Any allegations of mistreatment or abuse are thoroughly and expeditiously investigated by the Special Investigations Division (SID)."
Follow NBC Out on Twitter, Facebook & Instagram.

Tat Bellamy-Walker
Tat Bellamy-Walker is the desk assistant for NBC News' diversity verticals.

About
Contact
Help
Careers
Ad Choices
Privacy Policy

EX-J-2

2

SUBJECT: FOX REPORTING #2
DATE: 02/13/2025 06:29:29 AM

-----Institute, Cato on 2/12/2025 5:36 PM wrote:

>

ountry.
Last year, a man posing as a transgender female inmate at Riker's Island raped a female inmate, according to a lawsuit filed by the victim. Also, last year, Tremaine Deon Carroll, a biological male California inmate who identifies as female was charged with two counts of forcible rape and one of "dissuading a witness from testifying" after allegedly attacking a woman at Central California Women's Facility, according to a criminal complaint first obtained by the website 4W and later reported by Reduxx.
CALIFORNIA CORRECTIONAL OFFICERS FIRED FOR SEXUALLY ABUSING INMATES AT FEDERAL WOMEN'S PRISON PLEAD GUILTY

Tremaine "Tremayne" Deon Carroll, 52, a violent offender incarcerated in California, was charged with rape in Madera County. A transgender person, Carroll was housed in a women's prison by request and transferred to a men's prison after an indictment for rape. (CDCR)
Demi Minor, a New Jersey transgender inmate, impregnated two female inmates in 2022. Moore later expressed fear after being transferred out of the female-only prison in an interview with NJ.com. An Indiana judge ruled last year that a female-identifying, biological male convicted of killing a baby could get state-funded transgender surgery.
Hannah Tubbs is a transgender California inmate who, at 17 years old, was convicted of molesting a young girl in a Denny's bathroom in 2017. Under former District Attorney George Gascon's mandates for suspects under 18, Tubbs, who was 26 when the case was eventually tried, received a softball sentence of two years in a juvenile facility for girls because the date of the offense was just days before Tubbs' 18th birthday.

Hannah Tubbs began identifying as female after being arrested in a 2014 child molestation case in Los Angeles County. (Los Angeles County)
Before he could complete the sentence, however, a 27-year-old Tubbs was charged in Kern County with first-degree murder, threatening a witness, robbery and assault. Tubbs pleaded guilty to manslaughter and lesser charges in exchange for a 15-year prison sentence in November 2023.
(

IW Feature's new documentary series, "Cruel & Unusual Punishment: The Male Takeover of Female Prisons," shares stories of abuse and retaliation for voicing their concerns about the issue.
The Independent Women report is calling for solutions, including amending the Prison Rape Elimination Act to "prevent gender identity-based transfers to women's prisons," clarifying that the Americans with Disabilities Act "does not mandate 'transition' services or mixed-sex housing," protecting female inmates' rights to report abuse without retaliation, "eliminating reliance on activist medical guidelines" and "tying federal prison funding to policies that prioritize safety for female inmates."
Audrey Conklin is a digital reporter for Fox News Digital and FOX Business. Email tips to audrey.conklin@fox.com or on Twitter at @audpants.

The hottest stories ripped from the headlines, from crime to courts, legal and scandal.
Arrives Weekly
By entering your email and clicking the Subscribe button, you agree to the Fox News Privacy Policy and Terms of Use, and agree to receive content and promotional communications from Fox News. You understand that you can opt-out at any time.
Subscribe
Subscribed

Subscribe
You've successfully subscribed to this newsletter!

U.S.
Crime
Military

EX-K-3

3

Blue states count on women to ignore risks posed by transgender inmatesNearly half of male prisoners who identify as female have sex convictions, compared to less than 12% of the general male prison population By Audrey Conklin Fox News Published January 9, 2025 4:00am EST

FacebookTwitterFlipboardCommentsPrintEmailclose VideoWomen's group sounds alarm over biological males housed in female prisonsAmie Ichikawa spent five years in a California state prison after she was convicted of making terroristic threats with a gun. After her release, she began advocating for female inmates concerned about being housed with biological males.

A new study is sounding the alarm on female-identifying, biologically male felons being incarcerated at female-only prisons, saying those inmates pose physical and psychological risks to biological women.The report from Independent Women, a nonprofit, released Thursday and shared exclusively with Fox News Digital, says "male inmates identifying as women are disproportionately likely to have committed sexual offenses, and incarcerated women face heightened risks of harassment and assault under these policies."Placing trans-identifying males, especially those with fully intact male genitalia or a history of violent sex crimes, in close quarters with female inmates risks a serious deprivation of the female's rights," the report states. "These risks, and the consequences that have already manifested for women subjected to mixed-sex prison environments, are known, but are being deliberately ignored in deference to laws and policies that marginalize incarcerated women and silence concerns about their safety."Amie Ichikawa spent five years in a California state prison after she was convicted of making terroristic threats with a gun. After her release, she began advocating for female inmates concerned about being housed with biological males.BIOLOGICAL MEN ARE NOW WELCOME IN CALIFORNIA WOMEN'S PRISONS: AN AGENDA FOR FEMALE ERASUREAmie Ichikawa spent five years in a California state prison after she was convicted of making terroristic threats with a gun. After her release, she began advocating for female inmates concerned about being housed with biological males. (Independent Women)"It's because the laws are based on self-identification. The only requirement is for someone to state that they are a female," Ichikawa told Fox News Digital. "You can't base your denials on physical attributes, including retention of a penis. You can't deny somebody a transfer based on criminal history."Male inmates who identify as female will often sit before a review board to have cases heard and argue that sex-based prisons violate Equal Protection laws or claim they are being discriminated against on the basis of sex.Transgender, biological male inmates will also argue that their housing conditions in male-only prisons violate the Eighth Amendment's prohibition against cruel and unusual punishment, according to the Independent Women report.ALMOST 75% OF TRANSGENDER PRISONERS BEHIND BARS FOR RAPE, BRUTAL CRIMES IN THE UKIn four states, biological male inmates who identify as female can be placed in female-only prisons.States that allow housing of trans-identifying inmates based on gender identity. (Independent Women)Those states include California, Connecticut, Maine and New Jersey. Two states Utah and Louisiana prohibit men in women's prisons, while all others operate on a case-by-case basis.As of October 2024, there were 1,487 incarcerated men identifying as women in federal prisons only some of whom are housed in female prisons, according to the Federal Bureau of Prisons (BOP).WOMEN'S RIGHTS 'FORGOTTEN' IN FAVOR OF TRANS INMATES, FORMER PRISONER SPEAKS OUT IN NEW DOCUMENTARYPeople wave a Transgender Pride flag at the 2023 LA Pride Parade June 11, 2023, in Hollywood, Calif. (Robyn Beck/AFP via Getty Images)Nearly half of trans-identifying male prisoners have sex convictions, compared to less than 12% of the general male prison population nationwide, according to BOP statistics cited in the Independent Women report."Women do not deserve to be housed in locked prisons with violent criminal males, period," said May Mailman, legal director at Independent Women. "During the [2024 presidential] campaign, Kamala Harris, unashamed of her overt backing of trans-identifying men in women's prisons, tried to indicate the law required such insanity. "She was wrong. 'Cruel and Unusual Punishment: Stopping the Dangerous Policies Putting Men in Women's Prisons' makes clear that policy leaders hold clear authority to protect women and enforce sanity. This is a must-read for politicians and their staff trying to end the predations of gender ideology."Transgender policy advocates say housing female-identifying inmates in female-only prisons allows them to live in a safer environment because transgender women face sexual abuse in male-only prisons."Prisons and jails routinely subject transgender people in their care to abusive conditions, including denial of medical care, extended periods of solitary confinement, and harassment, sexual assault, and violence at the hands of guards and other people with whom they are incarcerated," the Transgender Law Center states on its website. "Recent studies show that transgender women are 13 times more likely to be sexually assaulted in prison than others."But female inmates have also faced sexual abuse at the hands of transgender inmates who are biologically male, and they feel their concerns are not being addressed.Female inmate Dana Gray told Independent Women she was sexually assaulted by a transgender woman "that was physically intact" in January 2023.Female inmate Dana Gray told Independent Women she was sexually assaulted by a transgender woman "that was physically intact" in January 2023. (Independent Women)"It was terrifying and disgusting because I knew there was nothing I could do," Gray said."This is a perfect Trojan horse into the biggest victim pool anyone could ever hope and dream of." Amie Ichikawa"The trans community has been hijacked as a hiding place for very mentally unwell sex criminals," Ichikawa said. "This is a perfect Trojan horse into the biggest victim pool anyone could ever hope and dream of. There [are] trans women that I speak to in men's prisons that want nothing to do with this and are horrified at the people that the states and federal institutions are allowing to transfer over [to female prisons]."Further, those against housing transgender inmates in female-only prisons also trigger traumatic events for some women.CA FEMALE INMATES FILE SUIT, CITING PRISON SEX ABUSE HASN'T STOPPED DESPITE PREVIOUS PROSECUTIONS OF OFFICERSChild sex trafficking survivor Alissa Kamholz had to share a cell with a female-identifying man affiliated with the same gang as her childhood abusers, according to the report.Child sex trafficking survivor Alissa Kamholz had to share a cell with a female-identifying man affiliated with the same gang as her childhood abusers, according to the report. (Alissa Kamholz)

EX-K-2

--------------------------------------------------------------------------------

SUBJECT: NYC CASE ON TRANS WOMAN RAPE B-W
DATE: 02/13/2025 06:28:24 AM

-----Institute, Cato on 2/12/2025 5:36 PM wrote:

>

hey how are you? here are the details you requested. https://www.nbcnewyork.com/investigations/man-posing-as-transgender-woman-raped-female-prisoner-at-rikers-lawsuit-says/5067904/ - Rikers Island: Man posing as transgender woman raped female prisoner, lawsuit says  NBC New York
Skip to content
Main Navigation
Search Search for:
Weather Local NBC NY 24/7 Video Newsletters Investigations Baquero Our Voices
Watch News 24/7 Trending
Streaming News 24/7 Eric Adams NYC Weather Super Bowl Trump Administration Taxes Send Photos/Videos New York Live Open House Expand 15 School Closings
 Rikers Island
Man posing as transgender woman raped female prisoner at Rikers, lawsuit says
Even after warnings and complaints, the victim said correction officers failed to remove the alleged perpetrator from female housing, despite allegedly propositioning the victim sexually and groping her in the shower. Days later, the victim claims she was sexually assaulted in her sleep by the perpetrator
By Chris Glorioso and Kristina Sola   Published January 24, 2024   Updated on January 24, 2024 at 1:43 pm

 NBC Universal, Inc.
What to Know
A former prisoner in the women's jail on Rikers Island is suing New York City, alleging jail staff ignored her warnings in 2022 that a transgender woman housed among females was actually a man pretending to be a woman in order to prey on the opposite sex behind bars
According to the civil suit, the victim not only believed the alleged perpetrator was lying about their gender identity but that the prisoner was purposely "instructed to claim that he was transgender by DOC staff so that he could stay in the female dorm where he would have access to female inmates"
Even after warnings and complaints, the victim said correction officers failed to remove the alleged perpetrator from female housing, despite allegedly propositioning the victim sexually and groping her in the shower. Days later, the victim claims she was sexually assaulted in her sleep by the perpetrator
A former prisoner in the Rose M. Singer women's jail on Rikers Island is suing New York City, alleging jail staff ignored her warnings in 2022 that a transgender woman housed among females was actually a man pretending to be a woman in order to prey on the opposite sex behind bars.
"His introduction was, `I'm not transgender. I'm straight. I like women,'" said the plaintiff, who is identified only as "Rose Doe" in the lawsuit.
24/7 New York news stream: Watch NBC 4 free wherever you are
According to the civil suit, Rose Doe not only believed the alleged perpetrator was lying about their gender identity but that the prisoner was purposely "instructed to claim that he was transgender by DOC staff so that he could stay in the female dorm where he would have access to female inmates."
Get Tri-state area news delivered to your inbox. Sign up for NBC New York`s News Headlines newsletter.
Investigative records obtained by Doe's attorneys and provided to the I-Team, show shortly after the alleged perpetrator arrived in the female dorm, Doe complained to correctional staff, claiming the new detainee sexually propositioned her on April 4th and then groped her in the bathroom on April 6th. After reviewing those complaints, the Acting Warden of the Rose M. Singer Center (RMSC), Floyd Phipps, sent an email saying, "I feel that individual is not a suitable fit for RMSC. . . . [Rose Doe] does not want to remain in the unit due to feeling unsafe."
Even after those warnings and complaints, Doe says correction officers failed to remove the alleged perpetrator from female housing. According to Doe's lawsuit, early on the morning of April 7th, "while Plaintiff was sleeping in her bed, the Perpetrator, took the opportunity to sexually assault Plaintiff again. . . .pull[ing] down her pants while she was sleeping and begin[ing] to rape her."
"I'll be scarred for the rest of my life," Doe told the I-Team.

EX- K-3

News
 Crime Stoppers 3 hours ago Woman nearly raped in Brooklyn Heights lobby by fake ICE agent in broad daylight
 Storm Team 4 4 hours ago Is it going to snow today? What to expect from 2nd winter system in days
Nicholas Liakas, the attorney representing Rose Doe said he fears the failure of corrections staff to promptly remove an imposter also endangers actual transgender inmates who have fought for years to have access to housing which aligns with their gender identities.
"When someone is claiming to be something they're not it's to the detriment of the entire community now, because it will cause concern," Liakas said. "Gender aside, when you have a clear danger it has to be removed and this is something where there were so many opportunities to step in and prevent a rape."
A spokesperson for the NYC Department of Correction declined to comment on the lawsuit, citing the fact that it is an active case. In a letter to Rose Doe, dated June 26, 2022, jail investigators said there was "insufficient evidence to make a final determination as to whether or not the event occurred."
The I-Team is not naming the alleged rapist because the prisoner has not been criminally charged. Though Doe says she reported the rape, her lawsuit claims DOC staff "covered up Plaintiff's sexual assaults by failing to provide her with adequate medical and mental health services, failing to collect, document, and review evidence."
The legal action, claiming a heterosexual man posed as a transgender woman in order to gain access to female detainees, comes one year after advocates for trans prisoners implored New York City Council and the Department of Correction to make it easier for inmates to get housing that aligns with their gender identities.
In a hearing last January on gender equity in jail, Dr. Rachel Golden, a psychologist who specializes in gender-affirming care for Transgender, Gender Non-Conforming, Non-Binary, and Intersex people (TGNCNBI), told lawmakers it would be a mistake to think it is common for men to pose as trans females behind bars.
"Fearmongering that one bad actor will pretend to be transgender and therefore create an unsafe environment results in the continued disproportionate targeting of TGNCNBI individuals for harassment and violence," Golden testified.
She added that trans women are far more likely to be the victims of sexual violence when they are housed in male facilities.
"There is little to no incentive to pretend to be transgender let alone to put in the work to sustain that ruse over time," Golden said. "There is absolutely no evidence that people pretending to be transgender is a common occurrence whereas there is ample evidence supporting the risk of violence and assault to transgender women being housed in a male facility."
According to the U.S. Bureau of Justice Statistics, transgender prisoners are far more likely to face sexual violence than the general population behind bars. A 2011-12 national survey of incarcerated individuals found nearly 16% of transgender inmates in local jails reported being sexually victimized. That compares with just 3% of the entire jail population.
In August of last year, the prisoner accused of raping Rose Doe was transferred to a maximum security prison for men after pleading guilty to the felony assault charges which originally landed him in Rikers.
Reached by phone, the father of the accused prisoner told the I-Team his son was "a troubled inmate" who "had a girlfriend when he went in," but he did not believe his son was capable of raping someone.
Prior to the alleged rape, Rose Doe's attorneys say there was ample evidence that introducing the new detainee to a female dorm might be dangerous, including jail disciplinary records showing the accused perpetrator had five open complaints recorded under the Prison Rape Elimination Act, a 2003 law that standardized the process for filing complaints about alleged sexual misconduct behind bars.
Liakas said the existence of those complaints should have prompted action   regardless of the inmate's gender identity.
"Whether or not this person was truly or not transgender ignores the fact that you had a history of complaints of predatory behavior," Liakas said. "This individual had documented complaints of harassment. It culminated with a rape after being ignored."
The investigative record shared with the I-Team also includes transcripts of recorded jail phone calls in which an inmate professes to be a heterosexual who manipulated his way into the women's dorm and is in seek of sexual rendezvous with female prisoners.
"I'm not gay...I don't want no penis," reads one of the transcripts. "Send me some workers over here, like a whole swap of workers, heterosexuals."
The name of the jail phone caller is redacted in the transcripts, but Doe's lawyers say it is likely the same prisoner who assaulted their client.
Rose Doe told the I-Team she agrees that transgender women can be safely housed among females. But she believes jail staff have a responsibility to act quickly when inmates raise concerns about potential imposters.
"They just took my complaint and said they'd do something about it and they never did," Doe said.
Last January, former Corrections Commissioner Louis Molina told City Council that Rikers Island housed about 50 people who self-identified as transgender, gender non-conforming, non-binary, or intersex. Of those, 38 were housed in their requested gender facilities. The department did not specify the reasons why the other dozen or so individuals were denied housing that aligned with their gender identities.
The DOC says, as much as possible, it seeks to accommodate an individual's desired housing placement in accordance with their gender identity.
This article tagged under:

2                    EX-K-4

|  | **Individualized Needs Plan - Program Review** (File copy) | SEQUENCE: 02026188 |
|---|---|---|
| | Dept. of Justice / Federal Bureau of Prisons | Team Date: 12-11-2024 |
| | Plan is for inmate: SHELTON, SHANTAI MONIQUE  18414-084 | |

| | | | |
|---|---|---|---|
| | Facility: | CRW  CARSWELL FMC | |
| | Name: | SHELTON, SHANTAI MONIQUE | |
| | Register No.: | **18414-084** | |
| | Age: | 35 | DNA Status:  HAF01026 / 11-22-2016 |
| | Date of Birth: | 10-03-1989 | CIMS Status:  YES |
| | Proj. Rel. Date: | UNKNOWN | CIMS Reconciled:  N/A |
| | Proj. Rel. Method: | LIFE | |

## Contact Information

**Emergency contact #1**

Amanda Lewis, MOTHER

980 Thessalonia Rd., Bremo Bluff , VA 23022 US

Phone (Home) : 434-484-2541

**Inmate is subject to 18 U.S.C. 4042(B) Notification:**                    **Yes**

    CURRENT CONVICTION FOR A CRIME OF VIOLENCE

**Inmate is subject to 18 U.S.C. 4042(C) Notification and Registration:**        **N/A**

## Offense Sentences

| Charge | Terms In Effect |
|---|---|
| 18:1962(D),18:1963(A) CONSPIRACY TO PARTICIPATE IN A RACKETEER INFLUENCE & CORRUPT ORGANIZATION (RICO) CT-1;18:1959(A)(1) VIOL CRIME IN AID OF RACKETEERING:KIDNAPPING, MURDER  OF KEVIN QUICK CTS:26 &28; 18:1512(A)(1)(C)& (A)(3)(A) TAMPERING WITH A WITNESS: MURDER OF KEVIN QUICK CT-30 | LIFE |
| 18:1951(A)HOBBS ACT ROB OF 7-11 CT-4;18:1959(A)(3)VIOL CRIM IN AID OF RACKET ASSLT W/DEADLY WPN CT-6; 18:1951(A) HOBBS ACT ROB OF COLUMBIA RD MRKT CT-8;18:1959(A)(3)VIOL CRIME IN AID OF RACKETEERING ASLT W/DEADLY WPN COL RD MRKT CT-10;18:1959(A)(3) VIOL CRIME IN AID OF RACKETEERNG:ASLT W/DEADLY WPN J.S. CT-12 | 20 YEARS |
| 18:924(C)(1)(A)(II) USE OF F/A IN COMMISSION OF ROBBERY CT-5 18:924(C)(1)(A)(II) USE OF FIREARM DURING A VIOLENT CRIME IN AID OF RACKETEERING CT-7 | 7 YEARS |
| 18:924(C)(1)(A)(II) USE OF FIREARM IN COMMISSION OF HOBBS ACTS ROBBERY OF COLUMBIA ROAD MARKET CT-9 18:924(C)(1)(C)(I) USE OF FIREARM DURING A VIOLENT CRIME IN AID OF RACKETEERING: COLUMBIA ROAD MARKET CT-11 | 7 YEARS |
| 18:942(C)(1)(C)(I) USE OF FIREARM DURING A VIOLENT CRIME IN AID OF RACKETEERING: ASSAULT ON J.S. CT-13 | 10 YEARS |
| 18:924(C)(1)(C)(I) USE OF FIREARM DURING A VIOLENT CRIME IN AID OF RACKETEERING:MURDER OF KEVEN QUICK CT.29;18:924(C)(1) (C)(I) USE OF F/A DURING THE TAMPERING OF WITNESS:MURDER OF KEVIN QUICK CT.31 | 10 YEARS |

## Detainers

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

## Pending Charges

Trespassing, Las Vegas, NV.

## Current CMA Assignments

| Assignment | Description | Start |
|---|---|---|
| BIR CERT Y | BIRTH CERTIFICATE - YES | 02-16-2022 |
| DEPEND Y | DEPENDENTS UNDER 21 - YES | 11-03-2020 |
| DRVE LIC N | DRIVERS LICENSE - NO | 06-02-2023 |
| LCP FAIL W | LIFE CONNECT PROG FAIL-WITHDR | 03-27-2018 |
| PHOTO ID Y | PHOTO ID - YES | 02-16-2022 |
| RELID NEED | RELEASE ID NEEDED | 12-26-2023 |
| RPP PART | RELEASE PREP PGM PARTICIPATES | 07-12-2018 |

EX-L-1



## Individualized Needs Plan - Program Review    (File copy)

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SHELTON, SHANTAI MONIQUE  18414-084

SEQUENCE: 02026188
Team Date: 12-11-2024

| Assignment | Description | Start |
|---|---|---|
| SSN CARD Y | SOCIAL SECURITY CARD - YES | 12-15-2021 |
| VET P/S N | PARENT/SPOUSE VETERAN - NO | 10-15-2017 |
| VETERAN N | VETERAN - NO | 10-15-2017 |
| V94 CVA913 | V94 CURR VIOL ON/AFTER 91394 | 11-22-2016 |
| WA NO HIST | NO WALSH ACT OFFENSE HISTORY | 09-30-2016 |

### Inmate Photo ID Status

Full status Incomplete - Expiration: null

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| CRW | LAUNDRY | LAUNDRY ORDERLY | 07-15-2024 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| CRW | ESL HAS | ENGLISH PROFICIENT | 11-15-2016 |
| CRW | GED HAS | COMPLETED GED OR HS DIPLOMA | 01-11-2017 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| CRW CC | C | ACE MAIN:LONG WALK TO FREEDOM | 11-26-2024 | 11-26-2024 |
| CRW LOW | C | MYSTERY OF THE LOST BULLET | 11-13-2023 | 11-13-2023 |
| TAL F | C | LEAN PROGRAM | 11-09-2022 | 06-29-2023 |
| TAL F | C | ACE- SOCIAL MEDIA MARKETING | 03-06-2023 | 04-10-2023 |
| TAL F | C | AEROBICS CLASS | 02-13-2023 | 04-02-2023 |
| TAL F | C | BEGINNING CARDMAKING CLASS | 01-30-2023 | 03-27-2023 |
| TAL F | C | RPP #6 40-HOUR DRUG EDUCATION | 06-09-2022 | 06-13-2022 |
| TAL F | C | CROCHET | 02-26-2022 | 03-31-2022 |
| TAL F | C | GR HLTHIER ME | 02-27-2022 | 03-21-2022 |
| TAL F | C | ACE - CIVICS AND GOVERNMENT | 06-09-2021 | 08-05-2021 |
| TAL F | C | CROCHET | 02-24-2021 | 06-13-2021 |
| TAL F | C | ACE- DEALING WITH STRESS | 11-16-2020 | 03-09-2021 |
| TAL F | C | AIDS AWARE RPP#1 | 12-08-2020 | 12-08-2020 |
| ALI | C | SHU CLASS BUDGETING | 05-27-2020 | 06-03-2020 |
| ALI | C | SHU CLASS CONFLICT RESOLUTION | 11-18-2019 | 12-02-2019 |
| HAF F | C | ACE: AMAZING LADIES | 03-16-2017 | 04-27-2017 |
| HAF F | C | ACE: WORLD RELIGIONS | 03-13-2017 | 04-26-2017 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| CRW CC | A-DES | OTHER AUTH ABSENCE RETURN | 07-15-2024 | CURRENT |
| CRW CC | A-DES | TRANSFER RECEIVED | 08-07-2023 | 07-15-2024 |
| TAL F | A-DES | WRIT RETURN | 11-15-2021 | 07-25-2023 |
| TAL F | A-DES | TRANSFER RECEIVED | 10-01-2020 | 08-03-2021 |
| ALI | A-DES | OTHER AUTH ABSENCE RETURN | 08-28-2019 | 09-23-2020 |
| ALI | A-DES | OTHER AUTH ABSENCE RETURN | 08-25-2019 | 08-25-2019 |
| ALI | A-DES | OTHER AUTH ABSENCE RETURN | 08-15-2019 | 08-25-2019 |
| ALI | A-DES | TRANSFER RECEIVED | 06-12-2018 | 08-15-2019 |
| CRW LOW | A-DES | TRANSFER RECEIVED | 08-29-2017 | 05-22-2018 |
| HAF F | A-DES | US DISTRICT COURT COMMITMENT | 11-15-2016 | 08-22-2017 |

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 11-28-2016 |
| CARE3 | UNSTABLE, COMPLEX CHRONIC CARE | 07-06-2023 |

EX-L-2

## Individualized Needs Plan - Program Review    (File copy)

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SHELTON, SHANTAI MONIQUE  18414-084

SEQUENCE: 02026188
Team Date: 12-11-2024

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| C19-T NEG | COVID-19 TEST-RESULTS NEGATIVE | 05-25-2022 |
| LOWER BUNK | LOWER BUNK REQUIRED | 10-02-2024 |
| NO PAPER | NO PAPER MEDICAL RECORD | 11-16-2016 |
| REG DUTY | NO MEDICAL RESTR–REGULAR DUTY | 11-21-2023 |
| YES F/S | CLEARED FOR FOOD SERVICE | 11-21-2023 |

### Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|
| FIT NO INT | FEMALE INT TRMT NO INTEREST | 11-01-2022 |
| RCPTWAIT | RESOLVE PHASE 2 CPT WAIT | 01-03-2024 |
| RP1 COMP | RESOLVE PHASE ONE COMPLETED | 01-03-2024 |
| RSW COMP | RESOLVE WORKSHOP COMPLETED | 02-16-2023 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 11-28-2016 |
| ED COMP | DRUG EDUCATION COMPLETE | 06-13-2022 |
| ED NONE | DRUG EDUCATION NONE | 11-22-2016 |
| NR WAIT | NRES DRUG TMT WAITING | 01-27-2020 |

### FRP Payment Plan

Most Recent Payment Plan

**FRP Assignment:**    **PART**    **FINANC RESP-PARTICIPATES**    **Start: 07-22-2019**

| | | | |
|---|---|---|---|
| Inmate Decision: | **AGREED** | **$50.00** | Frequency: **QUARTERLY** |
| Payments past 6 months: | **$100.00** | | Obligation Balance: **$17,019.99** |

### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $1,700.00 | $1,387.51 | IMMEDIATE | EXPIRED |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 2 | REST CV | $12,369.99 | $12,019.99 | IMMEDIATE | AGREED |

| Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|
| | 09-11-2024 | CRW | PAYMENT | INSIDE PMT | $50.00 |
| | 06-11-2024 | CRW | PAYMENT | INSIDE PMT | $50.00 |

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 3 | FINE | $5,000.00 | $5,000.00 | IMMEDIATE | AGREED |

*** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ***

### FRP Deposits

Trust Fund Deposits - Past 6 months:    $ N/A        Payments commensurate ?    N/A

New Payment Plan:    ** No data **

### Current FSA Assignments

| Assignment | Description | Start |
|---|---|---|
| AWARD | EBRR INCENTIVE AWARD | 07-11-2024 |
| FTC INELIG | FTC-INELIGIBLE-REVIEWED | 04-26-2021 |
| INELIG AUT | FTC-INELIGIBLE OFF CODE - AUTO | 12-17-2019 |
| N-ANGER Y | NEED - ANGER/HOSTILITY YES | 07-11-2024 |
| N-ANTISO Y | NEED - ANTISOCIAL PEERS YES | 07-11-2024 |
| N-COGNTV N | NEED - COGNITIONS NO | 07-11-2024 |
| N-DYSLEX N | NEED - DYSLEXIA NO | 05-30-2021 |
| N-EDUC N | NEED - EDUCATION NO | 07-11-2024 |
| N-FIN PV Y | NEED - FINANCE/POVERTY YES | 07-11-2024 |
| N-FM/PAR N | NEED - FAMILY/PARENTING NO | 07-11-2024 |
| N-M HLTH N | NEED - MENTAL HEALTH NO | 07-11-2024 |
| N-MEDICL Y | NEED - MEDICAL YES | 07-11-2024 |
| N-RLF Y | NEED - REC/LEISURE/FITNESS YES | 07-11-2024 |

EX-L-3



## Individualized Needs Plan - Program Review    (File copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: SHELTON, SHANTAI MONIQUE   18414-084

SEQUENCE: 02026188
Team Date: 12-11-2024

| Assignment | Description | Start |
|---|---|---|
| N-SUB AB N | NEED - SUBSTANCE ABUSE NO | 07-11-2024 |
| N-TRAUMA N | NEED - TRAUMA NO | 07-11-2024 |
| N-WORK N | NEED - WORK NO | 07-11-2024 |
| R-LW | LOW RISK RECIDIVISM LEVEL | 12-06-2024 |

### Progress since last review

Ms. Shelton is on the waiting list for Non-Residential Drug Treatment program, Resolve Phase 2 CPT, Assert Yourself, Basic Cognitive Skills, Women's Basic Finance, Women's Relationships, Sex Safe, Academic Success, Anger Management, and Emotional Self-Regulation.

No interest in other recommended program. She has completed the Long Walk to Freedom (11-26-2024).

### Next Program Review Goals

SHORT TERM GOAL: Ms. Shelton should enroll in the Women's Basic Finance class by her next team scheduled for 06-08-2025.

### Long Term Goals

LONG TERM GOAL: Ms. Shelton should complete the Anger Management class by 01-2030.

### RRC/HC Placement

No.
Management decision - SENTENCE LENGTH.
Consideration has been given for Five Factor Review (Second Chance Act):
- Facility Resources
- Offense
- Prisoner
- Court Statement
- Sentencing Commission

### Comments

407/408 reviewed and current.
Judicial Recommendations: Yes, Placement based on security concerns, if possible..
Ms. Shelton should seek Psychology Department services as needed.  She has clear conduct since December 2023. Ms. Shelton is working in Laundry. She should make any scheduled payments on her FRP through her next team (See J & C). Ms. Shelton is ineligible for RRC referral due to her sentence length. She has a Security card, Birth Certificate, and Photo ID card.

Finance/Poverty Need Screen
Is there documentation in the PSR of any of the following?
X No bank account
X Debts noted in Credit Report or other sources
X YES (if any of the above, check yes)
If the answer is yes, the inmate has a financial/poverty skills need.

Routine Reassessment conducted, no PREA concerns met or noted.

EX-L-4

FSA Recidivism Risk Assessment (PATTERN 01.03.00)

Register Number:18414-084, Last Name:SHELTON

**U.S. DEPARTMENT OF JUSTICE**                          **FEDERAL BUREAU OF PRISONS**

Register Number: 18414-084                Risk Level Inmate....: R-LW          *LOW*
Inmate Name                                 General Level......: R-LW (9)
  Last.........: SHELTON                     Violent Level......: R-MIN (-1)
  First........: SHANTAI                   Security Level Inmate: MINIMUM
  Middle.......: MONIQUE                   Security Level Facl..: ADMIN
  Suffix.......:                           Responsible Facility.: CRW
Gender.........: FEMALE                    Start Incarceration..: 09/19/2016

## PATTERN Worksheet Summary

| Item | Value | General Score | Violent Score |
|---|---|---|---|
| Current Age | 35 | 18 | 3 |
| Violent Offense (PATTERN) | TRUE | 1 | 3 |
| Criminal History Points | 2 | 8 | 1 |
| History of Escapes | 0 | 0 | 0 |
| History of Violence | 0 | 0 | 0 |
| Education Score | HighSchoolDegreeOrGED | -6 | -2 |
| Drug Program Status | NoNeed | -9 | -3 |
| All Incident Reports (120 Months) | 14 | 3 | 0 |
| Serious Incident Reports (120 Months) | 0 | 0 | 0 |
| Time Since Last Incident Report | 11 | 2 | 1 |
| Time Since Last Serious Incident Report | N/A | 0 | 0 |
| FRP Refuse | FALSE | 0 | 0 |
| Programs Completed | 9 | -6 | -3 |
| Work Programs | 1 | -2 | -1 |
| | Total | 9 | -1 |

## PATTERN Worksheet Details

Item: Programs Completed, Value: 9

General Score: -6, Violent Score: -3

Risk Item Data

| Category | Assignment | Start | Stop |
|---|---|---|---|
| DRG | ED COMP | 06/13/2022 14:45 | |
| EDC | SFF RELG | 03/13/2017 18:30 | 03/13/2017 18:30 |
| EDC | SFF LADIES | 03/16/2017 18:30 | 03/16/2017 18:30 |
| EDC | SHU CONFLI | 11/18/2019 10:00 | 11/18/2019 10:00 |
| EDC | STRESS | 11/16/2020 08:00 | 11/16/2020 08:00 |
| EDC | CIVICSGOV | 06/09/2021 00:01 | 06/09/2021 00:01 |
| EDC | SOCIALMEDI | 03/06/2023 18:00 | 03/06/2023 18:00 |
| EDC | JFK | 11/13/2023 17:45 | 11/13/2023 17:45 |
| EDC | MANDELA | 11/26/2024 17:45 | 11/26/2024 17:45 |

Item: Work Programs, Value: 1

General Score: -2, Violent Score: -1

Risk Item Data

*EX-M*

| Category | Assignment | Start | Stop |
|---|---|---|---|
| WRK | IND CC1 | 11/15/2021 18:50 | 11/15/2021 18:50 |

Assessment Date: 12/06/2024                (1)                Assessment# R-2146:12156



...ict Court

...nouse

...the Clerk

...n Rd Sw

...A 24011

RECEIVED

MAR 3 1 2025

USDC Clerk's Office
Mail Room

legal



FMC Carswell
P.O. Box 27066
Fort Worth, TX 76127
Mailed: __03-06-2025__
The enclosed letter was processed through special
mailing procedures for forwarding to you. The letter
has neither been opened nor inspected. If the writer
raises a question or problem over which this facility
has jurisdiction, you may wish to return the material
for further information or clarification.    (*)

Sha
FMC Carswell
P.O. Box 27137
Fort Worth, TX 76127

US Dist
US Court
office of
210 Frankl
Roanoke V